W. L. Harris and Dolly T. Harris, His Wife v. Commissioner.
W. Harris v. Commissioner
Docket No. 14843.
United States Tax Court
1948 Tax Ct. Memo LEXIS 45; 7 T.C.M. (CCH) 820; T.C.M. (RIA) 48235; November 12, 1948
*45 1. Held, respondent's method of determinating income and consequent deficiencies was arbitrary and without rational or reasonable basis. 2. Amount of deficiencies determined on the proof of record. 3. Fraud penalties disapproved. Wm. K. Goolrick, Esq., for the petitioners. E. M. Woolf, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion VAN FOSSAN, Judge: The respondent determined deficiencies in the income taxes of the petitioners and imposed penalties, as follows: INCOME TAX
Years
Assessed
Refund
Deficiency
25% Penalty
50% Penalty
1919
$ 224.69
$ 56.17
1920
127.56
31.89
1921
103.69
25.92
1922
62.97
15.74
1923
109.49
27.38
1924
134.64
$ 67.32
1925
99.09
49.55
1926
370.40
92.60
185.20
1927
633.52
158.38
316.76
1928
656.49
328.25
1929
153.14
38.29
76.57
1930
145.14
36.28
72.57
1931
153.88
38.47
76.94
1932
273.18
68.30
136.59
1935
140.73
35.18
70.37
1936
513.58
128.40
256.79
1937
866.18
216.55
433.09
1938
947.31
236.83
473.66
1939
1,046.63
261.66
523.32
1940
2,328.46
1,164.23
1941
$7.20
$5.98
8,348.60
4,174.30
1942
23,909.31
11,954.66
1943
21,345.61
10,672.81
$62,694.29
$1,468.04
$31,032.98
*46 The basic issue is whether or not the petitioners had income in the amounts determined by respondent. A secondary issue is whether respondent erred in imposing the penalties for the years in controversy as above set forth. Findings of Fact The petitioners, husband and wife, are colored individuals residing in Fredericksburg, Virginia. They filed income tax returns for the years 1924, 1925, 1928, 1940, 1941, 1942 and 1943 with the collector of internal revenue for the district of Virginia. The petitioner, W. L. Harris, hereinafter called the petitioner, was born in Essex County, Virginia, in 1890. He attended grammar school, was graduated from the State Normal School and, in 1918, was graduated in dentistry from Howard University, Washington, D.C. In that year he began the practice of dentistry in Lynchburg, Virginia, and later in the year in Fredericksburg. From 1920 to 1925 he practiced his profession in both Fredericksburg and Alexandria, Virginia. From 1925 to 1932 he practiced in Fredericksburg. From 1932 to 1935 he practiced in Cumberland, Maryland, and since 1935 he has maintained his dental office only in Alexandria. In 1939 he purchased a building in Alexandria in which *47 his office is situated, for $8,000; of that sum, $700 was borrowed from a building and loan association, $400 from a bank and the remainder raised from different sources. He still owes $4,000 thereof. His aggregate indebtedness is over $18,000, secured by liens on his various properties. In 1919, the petitioner purchased an interest in the McGuire Hotel at 523 Princess Anne Street, Fredericksburg, paying $750 for one-half interest therein. He paid $900 for the other half interest in 1926. The hotel was almost wholly destroyed by fire in December, 1925. His records were burned. He rebuilt and remodeled the building in 1926, at a cost exceeding $11,000, which he secured by borrowing $4,000 from the bank, $1,500 from individuals and $6,000 from a building and loan association. He repaid the building and loan association loan in 1932. In 1928, he purchased a three-room house on Wolfe Street for $1,500, which he borrowed from Willis and Willis, and repaid that loan by borrowing from the bank. Prior to 1928 the hotel was operated by others, but in that year the petitioner's wife assumed its management and continued to operate it until 1938. At that time the hotel contained 38 rooms. *48 The petitioner owns property at 521 Princess Anne Street (now a part of the hotel property) purchased for $1,700 in 1935. He owns a small farm of five acres for which he paid $500 and on which he built small buildings, costing $600 or $700. He also owns 32 lots in a colored subdivision (known as Mayfield) for which he paid $4,800, $500 in cash and the balance in notes secured by a deed of trust. Such notes are still unpaid. McGuire, Incorporated, owns 168 lots in Mayfield, purchased in 1943 for $6,500. The petitioner and his wife owned 15 and 10 shares of stock, respectively, in the corporation, purchased at $100 a share. In 1942 and 1943 he owned three-eighths of the McGuire Taxi Service, which operated eight cabs in Fredericksburg. He received three-eighths of the revenue therefrom. The other five cabs were owned by other individuals and were registered in their respective names. Beginning on October 17, 1926, the petitioner established and thereafter maintained a card record, made by him, of his patients, showing their names, the services performed for and the amounts paid by them. He has a record of his monthly income from his practice from 1925, the date of the fire in McGuire *49 Hotel, to the present time. The petitioner kept his book records in code, which was readily decipherable. He kept his card record in figures. In October, 1938, the petitioner, by verbal agreement, leased the McGuire Hotel to Eva Taliaferro, his wife's sister-in-law, at $75 a month, with the provision that all rents and profits were to be used in repairing and renovating the building, and when that operation was completed the rent was to be fixed at $125 a month. The repair work was not completed until 1941 and on January 1 of that year, the lessee began paying the petitioner the stipulated sum of $125 per month. Eva Taliaferro and her husband, Ramsey, were employed by John L. Pratt, a retired executive of General Motors. She abandoned such employment in order to attempt to make the hotel a paying enterprise. She has operated the McGuire Hotel from 1938 to the present time. The petitioner has had no interest or part in the active management of the hotel since January 1, 1939, but for reasons satisfactory to the parties, all money received by the hotel was handled through petitioner's bank accounts, both as to deposits and payment of accounts. From 1939 to 1943, inclusive, Eva Taliaferro *50 and Ramsey Taliaferro filed Federal income tax returns on which they reported the income from the operation of the McGuire Hotel for those years. The petitioner had deposits in three banks in Fredericksburg and two in Alexandria. Often deposits were shifted from bank to bank in order to pay current bills. The proceeds from numerous loans were deposited in the banks. Although petitioner had leased the hotel property, all money arising from its operation was deposited in and paid out of his bank accounts. The following is a statement of the aggregate deposits in the five banks made during the years in controversy: Year
Totals
1918
$ 417.00
1919
3,225.47
1920
2,362.73
1921
2,026.13
1922
1,451.92
1923
3,719.14
1924
6,266.14
1925
6,517.49
1926
16,276.44
1927
13,218.67
1928
12,647.81
1929
8,125.62
1930
7,159.58
1931
7,212.62
1932
4,851.19
1935
5,039.52
1936
7,925.34
1937
9,420.97
1938
10,300.84
1939
9,888.18
1940
13,309.59
1941
19,809.11
1942
37,346.79
1943
31,763.50
Total
$240,281.79
The deposits of the receipts from the operation of the McGuire Hotel were made in the Farmers and Merchants Bank and later in the National *51 Bank, both in Fredericksburg. While the petitioner's wife operated the hotel, she signed her name to checks on the account and the petitioner also was authorized to sign her name to them. The bank accounts were continued in Dolly T. Harris' name (or in the name of D. T. Harris) after the hotel was leased to Eva Taliaferro. They were so carried because former lessees had been unsuccessful in the operation of the venture and the property had been returned to the petitioner. The petitioner and his wife and Eva Taliaferro were authorized to sign Dolly T. Harris' name to checks against the hotel deposits. In June, 1944, a Special Agent, Intelligence Unit, Bureau of Internal Revenue, requested the petitioner to call at his office in the Post Office Building in Alexandria. The petitioner complied. The agent asked him certain questions and made notes of his answers. At the time, the agent had the petitioner's income tax returns for the years 1942 and 1943 before him and told the petitioner that he wanted to ask some questions about them. He did not refer to any other returns for any other years except to ask if the petitioner had filed such returns. The agent discussed with the petitioner *52 only the latter's income from his dental practice. He asked the petitioner, "How do you pay your dental supply bills?" The petitioner replied, "Sometimes I paid it by check and sometimes by cash." The agent then asked, "But how much?" and the petitioner answered, "I should judge about half." Later the agent prepared the following statement, took it to the petitioner's office, and the petitioner signed it: "My full name is Webster Lee Harris. I was born in Essex County, Virginia, December 25, 1890, married Thea Taliaferro September 17, 1923, and have no children. I attended grammar school at Caret, Virginia, graduated from State Normal School at Petersburg, Virginia, and graduated in dentistry from Howard University, Washington, D.C., in the year 1918. In August, 1918, I began the practice of dentistry in Fredericksburg, Virginia. From 1920 to 1932 I practiced dentistry in both Alexandria, Virginia, and Fredericksburg, Va. In 1932 I gave up the Fredericksburg, Virginia, office and since then have been practicing only in Alexandria, Virginia. My wife lives at the McGuire Hotel at Fredericksburg, Virginia. I consider Fredericksburg, Virginia, my home. My address is 523 Princess Anne *53 St., Fredericksburg, Virginia. "In 1919 I purchased what is now the McGuire Hotel and remodeled it in 1922 and 1926. I began operating the hotel in 1922. My wife operated the hotel until 1938, at which time Eva Taliaferro took over the operation of the hotel. Eva Taliaferro is my wife's sister-in-law. In 1942 I began operating a taxicab business. There are eight licensed cabs under the name McGuire Taxi Service. I bought three of the above taxicabs, three were bought out of hotel income, one was bought by Dolly Tucker and one by Ramsey Taliaferro. These cabs are operated on the basis of all operating expenses deducted, 10% of gross deducted for upkeep and the balance divided equally with drivers. The records for the hotel operation are in Fredericksburg, Virginia, the records for my dental practice are in Alexandria, Virginia. I do not believe any permanent records are kept for the taxicab business. I keep a record of my receipts in my dental office but do not keep a complete record of expenses. "I have done business with Planters Bank, Farmers and Merchants Bank, and the National Bank, all of Fredericksburg, Virginia and also, the Citizens Bank, Alexandria, Virginia, and the *54 Alexandria National Bank, Alexandria, Virginia. I do not have a safe deposit box anywhere. The only real estate owned by me is in Fredericksburg, Virginia, and Alexandria, Virginia. I do not own any stock or bonds except U.S. Government Bonds. I own about three or four hundred dollars worth of U.S. Government Bonds. From about 1923 to 1940 no Federal income tax returns were filed. The reason no returns were filed was because my income was not sufficient to require returns to be filed. I knew what the requirements were for filing returns for these years and my income was less than the required amount. My wife has no income other than what she gets from me. I have never inherited any property. "I now own three personal automobiles, a 1939 Cadillac Coupe, 1940 Pontiac Sedan and a 1941 Buick Sedan. The titles to all three of these cars are in my wife's name. My personal living expenses would amount to a minimum of $3000.00 a year. I spend quite a bit for train and bus fares going back and forth from my office in Alexandria, Virginia, to my home in Fredericksburg, Virginia. "I have a loan on Alexandria property at Alexandria, Virginia, payable at Alexandria National Bank. I also have *55 deed of trust loans on my Fredericksburg, Virginia, property. There are no liens against my taxicabs or personal automobiles. "The license fees shown on 1943 return for truck is for a truck in the name of Clifford Hall, my nephew. The truck is used to haul feed to chicken and hog farm in which I have an interest and to bring in produce from farm. This farm is in the name of my wife. "About half of my entire receipts are paid out in cash that is never deposited in the bank. The other half of my receipts are deposited. I do not keep any book records. The only record I keep is a card record for my dental income. Book records are kept for the hotel operation." After securing the petitioner's signature to the statement the agent left. He thereafter computed the petitioner's income tax liability for the years from 1919 to 1943, inclusive, by taking the petitioner's total bank deposits, multiplying them by two, allowing expenses for most years in the same percentage to receipts as was shown in the 1942-1943 returns, applying such percentage (11.35 per cent) to the petitioner's income for the several years (computed as above), and thus arriving at the figures shown in the notice of deficiency. *56 The same procedure was followed in most of the years in computing the income from the Hotel McGuire operations (the percentage there being 48.18, as shown on the return of that operation for 1943 filed by Ramsey and Eva Taliaferro) and the income thus arrived at was charged to petitioner, this notwithstanding the fact that the hotel was leased in 1938 and thereafter petitioner received as his own only the fixed rental. The agent computed the income from the McGuire Taxi Service by basing it on the amount of gasoline allotted to that Service by the Fredericksburg Rationing Board. He based the profit on the taxi business on the percentage of profit made by the Hildrup Taxi Service in Fredericksburg. In determining the amounts in the petitioner's several bank accounts during the taxable years, the agent did not take into account or attempt to trace funds transferred from one of the petitioner's banks to another nor the amounts representing loans nor moneys given to him by others to complete various transactions or sums deposited to the petitioner's credit from other sources. He found no evidence that the petitioner had paid out the sums which formed the basis of his computation of the *57 petitioner's income for such years. In his notice of deficiency, the Commissioner stated, "The determination of your income tax and penalty liabilities has been made upon the basis of information on file in this office," and in his "Explanation of Income" for each year he stated, "In the absence of adequate records, your taxable net income has been determined as follows:" (a) Bank deposits $ Cash paid out - not deposited $ Total receipts from dental practice
Less: Business expenses
Taxable net income
$ He employed the same method in determining the net income from the hotel business and computed the net income from taxi cabs as heretofore set forth. On September 7, 1945, an accountant employed by petitioner, prepared a report and statement showing the petitioner's earnings and net income for the years 1938 to 1943, inclusive. He included therein the income and expense accounts of the McGuire Hotel and McGuire Taxi Service. The report was prepared from records, canceled checks, invoices and statements. Since not all canceled checks, paid invoices, etc., were available, he reconstructed his report by assigning as continuing expenses the figures which *58 were supported by proper records covering pertinent periods. Such items were light, rent, telephone and similar charges. The accountant also cross-checked and eliminated the transfer of funds from one bank to another, the payment of hotel bills which later were repaid, the use of the petitioner's bank accounts to complete business transactions for others who repaid the petitioner, the inclusion of loans made to the petitioner and other items which did not properly constitute income. Generally the petitioner's professional expenses were at least 50 per cent of his gross income from his profession. In the following tabular statement we have set out petitioner's gross income, estimated expenses and net income, all as computed by us for each of the years here involved: Gross
Estimated
Net
Year
Income
Expenses
Income
1919
$ 4,750
$1,612.73
$3,137.27
1920
3,550
1,181.36
2,368.64
1921
3,200
1,013.06
2,186.94
1922
2,425
725.96
1,699.04
1923
5,600
2,454.81
3,145.19
1924
7,500
5,020.97
2,479.03
1925
7,600
4,755.80
2,844.20
1926
7,200
5,126.27
2,073.73
1927
10,800
7,956.52
2,843.48
1928
8,500
6,448.83
2,051.17
1929
8,400
4,933.95
3,466.05
1930
8,750
4,722.20
4,027.80
1931
8,900
4,599.67
4,300.33
1932
6,200
2,992.37
3,207.63
1935
6,450
4,138.44
3,211.56
1936
9,100
5,928.37
3,171.63
1937
10,600
6,134.84
4,465.16
1938
5,260
1,654.19
3,605.81
1939
3,700
1,431.40
2,268.60
1940
4,250
1,844.83
2,405.17
1941
6,300
2,431.41
3,868.59
1942
11,040
3,218.25
7,822.52
1943
11,524
3,398.95
8,125.05
*59 No part of the deficiencies due from petitioner is due to fraud with intent to evade tax and the petitioner is not subject to the fraud penalties imposed by the respondent for any of the years in controversy. The penalty for negligence was properly imposed on him for the years in which he filed no return. Opinion The petitioner challenges the action of the respondent in computing the deficiencies involved in the case at bar, on the ground that it was arbitrary and unwarranted; that it resulted in the determination of an excessive tax and that it was without rational foundation. He cites , and the principles therein set forth. After a careful study of the record, with especial attention to the method used by respondent in determining the deficiencies, we have come to the conclusion that petitioner is justified in his contention and that the respondent's action was arbitrary and unreasonable. A study of the years 1926 and 1943 will suffice to demonstrate the arbitrary character and consequent inaccuracy of the respondent's method of determining income. In the year 1926 petitioner had aggregate deposits of $16,276.44. The record *60 establishes that in this figure were included $1,300 fire insurance proceeds, $7,250 proceeds from bank loans, and $1,450 proceeds of loans from individuals, or a total of non-income items of $10,000. Proper charges against the total bank deposits were expenses of the dental profession of $1,003.29, and hotel operating expenses of $4,122.98, or a total of $5,126.27. The total of all such items is $15,126.27, which leaves, when deducted from the total bank deposits, $1,150.17. Although we are unable on the whole record to approve petitioner's computations and have determined a considerably larger net income, the example is nonetheless illuminating. In analyzing the year 1926, respondent made no effort to check the source of the large deposits and deducted nothing for insurance proceeds or for loans. He determined that petitioner received gross income of $12,013.16 from dental practice, against which he allowed $1,363.49 expenses, and gross income of $8,539.72 from the hotel, with expenses of operation of $4,122.98, making a net income of $15,066.41. We are not fully informed as to how he arrived at most of these figures but we do have the testimony of the man who compiled them that, *61 as a starting point, relying on an unwarranted interpretation of a conversation with petitioner, he multiplied the bank deposits by two, apportioned the income to the dental practice and the hotel and deducted as estimated expenses the figures shown, thus arriving at the net income shown. Turning to the year 1943, we find an even more arbitrary treatment. Taking the figure of $5,259.16 as gross receipts from dental practice, he deducted estimated expenses of $1,626.65, leaving a net profit of $3,632.51. He then stated the gross receipts from the hotel at $58,267.84, from which he deducted estimated expenses of $24,449.22, leaving a net profit of $33,818.62. To this he added a net profit of $6,955.61 ($22,437.45 gross receipts, minus $15,481.84 estimated expenses) as proceeds of the taxicab business. He thus arrived at a total net income of $44,406.74. That respondent merely took the bank deposits and doubled them as a starting point is seen if the first two figures of gross income above be added together ($5,259.16 plus $58,267.84 equals $63,527), which, divided by two, equals $31,763.50, the exact amount of the total bank deposits. The large amount of bank deposits in the year *62 1943 is accounted for by the fact that, although petitioner had leased the hotel to his wife's sister-in-law in 1938, by whom it was operated thereafter, for reasons satisfactory to them, all money taken in at the hotel thereafter was deposited in petitioner's bank account and all expenses paid therefrom. Careful records were kept by the Taliaferros of the operation of the hotel, which would have enabled respondent, had he pursued his inquiry, to ascertain the facts as to the years of their operation. In June, 1944, the respondent's agent called the petitioner to his office, asked him certain questions, took notes of his answers and prepared a statement purporting to embody such answers. He and the petitioner discussed only the latter's 1942 and 1943 income tax returns and limited their discussion to income from the petitioner's dental practice. In one question the petitioner understood the agent to refer to the method of the petitioner's payment of his dental supply bills and stated that the payments were made half by check and half in cash. In the prepared statement signed by the petitioner, there appear the following words: "About half of my entire receipts are paid out in *63 cash that is never deposited in the bank. The other half of my receipts are deposited." Generalizing on this statement and relying solely on it as his authority, the agent took the total bank deposits of the petitioner for each year from 1919 to 1943, inclusive, doubled them, deducting an arbitrary percentage presumed to represent the petitioner's expenses (based on the percentage of such expenses to gross receipts appearing on his 1942 and 1943 returns) and determined the result to be the petitioner's net income. The agent also charged the petitioner with the operation of the McGuire Hotel from the date of purchase to 1943 and computed his income on the same basis but allowed the percentage of expenses to gross income as shown in the above mentioned returns. He likewise charged the petitioner with all of the alleged profit from the McGuire Taxi Service by computing it on the basis of the amount of gasoline allotted by the Fredericksburg Rationing Board, and assigning to the taxi business the same rate of profit as was made by another taxi service in Fredericksburg. In his notice of deficiency the respondent attempted to justify his action on the ground of "the absence of adequate *64 records." That the agent was not justified in his interpretation of the statement signed by petitioner is plain on a reading of the record. Obviously, petitioner did not appreciate the full purport of the language used in the document. The agent did not intimate any such interpretation in presenting the paper to petitioner nor did petitioner intend his statement to have the wholesale effect given it by the agent. Petitioner testified he was referring to the expenses for dental supplies and nothing more. We were well impressed by the complete frankness of petitioner as a witness and we believe his testimony as to this matter. The utter absurdity of the agent's interpretation is seen when we look at the bank deposits in the years 1942 and 1943. At the outset, it may be said that the petitioner's records were not complete. It would be unusual if they were - over a space of 25 years. However, petitioner undertook to make proof of his income during the earlier years and an accountant employed by petitioner was able to compile an elaborate and detailed report for the years 1938 to 1943, inclusive. Some routine invoices, statements, payments and receipts were missing but they were "continuing" *65 expenses and easily calculated. The agent admitted that he did not take into account or trace funds transferred from one bank to another. He ignored loans deposited in the banks and deposits representing moneys entrusted to the petitioner by others. The records reveals that the petitioner deposited the proceeds of many loans. In some cases new loans were secured to repay existing loans on which payment had to be made. These large items obviously were not received by the petitioner in payment of dental accounts. The agent could and should have made further inquiry from the bank officials, the petitioner, or the lenders. We have no doubt that he could have obtained many additional facts and figures had he been inclined to ask and proceed further. The percentage of expenses to gross income applied to the years prior to 1942 is obviously low. The ratio of expense to gross receipts varies with the locality, the character of the practice, the type of patients and other factors, but the normal percentage is established to be about 50 per cent - not 11.35 per cent used by the agent in the earlier years. Furthermore, the agent found no evidence whatever, nor was any adduced before us, that *66 the petitioner had expended or now possesses any such sums as he is charged with receiving. The petitioner still owes over $18,000, secured by liens on his property. Although the petitioner's records may have been "inadequate" for precise and complete verification of his returns, this fact does not justify the respondent in determining the income upon a basis which is plainly not consistent with the surrounding circumstances and which gives results absurd on their face. The determination was without rational foundation and was arbitrary and excessive. Although the record is not precise nor free from inconsistencies with respect to the amount of income earned by petitioner, there are sufficient data which, when collated, enable us to make a reasonable approximation of such income. The results of these computations appear in the findings of fact and will be given effect in the computation consequent hereon. In arriving at such figures, we have given effect, as best we can, to all facts established by the testimony and exhibits. In this connection, attention is called to the fact that petitioner estimated his living expenses at $3,000 a year *67 and the further fact that petitioner admitted that he paid approximately one-half of his dental supply bills for 1922 and 1923 in cash, which never went through his bank account. The record does not segregate the dental supply bills from other office expenses. There are also many other items of expense not specifically accounted for. We deem it unnecessary to discuss at length each year from 1919 to 1937, inclusive. During that period (in 1925) the petitioner's records were burned. He had records of the monthly income from his practice thereafter and from October 17, 1928, he has maintained card records of his patients. He stated, "I have a record of every patient I wait on, what I did and how much I collected." The agent was informed of the card system and the petitioner offered to show him any records at any time. The agent arbitrarily termed these records "inadequate" and declined to employ them. The respondent has also ignored completely the returns filed by Eva Taliaferro and Ramsey Taliaferro, covering the operation of Hotel McGuire, although they were in his files. The petitioner stated that he had received the rent from the hotel from the lessee from October, 1938, to the *68 present time and had reported it in his income tax returns. As heretofore noted, the respondent likewise charged the petitioner with the total income received by the McGuire Taxi Service. The evidence shows conclusively that he owned only three of the eight cabs in service and received but three-eights of the income from the enterprise, facts which were readily ascertainable. He included his share of the total income in his returns for 1942 and 1943. The automobiles used were registered in the names of their respective owners. That fact could have been ascertained by inquiry. As we read the record, the petitioner is a substantial colored citizen of Fredericksburg, who has enjoyed the confidence and respect of representative white citizens of that community. The petitioner complied with the agent's original request to disclose his income for the years 1942 and 1943 and exhibited no disposition whatever to conceal his receipts or records. His conduct and his personal and business record point clearly to the conclusion that he was not guilty of fraud. We are convinced that he made an honest effort to arrive at his correct income and had no intent or purpose to evade the payment of his *69 just taxes. We have found and set out the amount of petitioner's net income for all of the years in controversy. Petitioner filed returns for the years 1924, 1925, 1928, 1940, 1941, 1942 and 1943. Since no returns were filed for the other years in question and petitioner has not shown reasonable cause for his failure to file such returns, he is subject to the 25 per cent negligence penalty. We have found as a fact that he is not subject to the fraud penalty for any year before us and we so hold. Decision will be entered under Rule 50.