A. Robert Teichner and Sylvia B. Teichner v. Commissioner.
Teichner v. Commissioner
Docket No. 5977-67.
United States Tax Court
T.C. Memo 1970-311; 1970 Tax Ct. Memo LEXIS 48; 29 T.C.M. (CCH) 1430; T.C.M. (RIA) 70311; November 12, 1970, Filed. A. Robert Teichner, pro se, 2355 64th St., Brooklyn, N. Y. William F. Chapman and Rufus H. Leonard, Jr., for the respondent. STERRETT
Memorandum Findings of Fact and Opinion STERRETT, Judge: The respondent determined a deficiency in the petitioners' Federal income tax for the taxable year 1962 in the amount of $158,226.19 and an addition to the tax in the amount of $7,911.31 under section 6653(a). [1]
The respondent's notice of *49 deficiency sets forth four items which compose the deficiency asserted herein: (1) additional 1431 income by reason of unexplained bank deposits; (2) disallowed interest expense deduction; (3) disallowed medical expense deduction; and (4) an addition to the tax by reason of negligence. In addition, in their petition the petitioners claimed an additional interest expense deduction of $2,500 for 1962 to which the respondent contends they are not entitled. Findings of Fact Some of the facts were stipulated. The stipulation and the exhibits attached thereto are incorporated herein by this reference. A. Robert and Sylvia B. Teichner, husband and wife (hereinafter referred to as petitioners or Robert and Sylvia individually), resided in Brookyln, New York at the time their petition herein was filed. They filed their joint Federal income tax return for 1962 with the district director of internal revenue, Brooklyn, New York. Robert was an attorney admitted to practice in all of the courts of New York State as well as several Federal courts. Beginning in 1945 Robert's sight began to fail so that in 1950 he was compelled by blindness to give up his law office. From that time to the *50 date of trial Robert engaged in a limited practice of law from his residence. For the taxable year 1962 Robert reported gross income of $3,750 from his law practice and expenses of $4,275. During 1962 Sylvia worked as a secretary for Jarc Realty and Management Corp. (hereinafter Jarc). She reported wages of $5,460 on the petitioners' joint income tax return for the year; from this amount $525.20 was withheld for Federal income taxes and $150 for Social Security. The petitioners lived in the home of Sylvia's mother, Bella Bloom (hereinafter Bella). The petitioners paid Bella rental of $125 per month. In addition to the rental payments the petitioners' weekly living expenses were approximately $75, of which $30 constituted amounts expended for food. Due to medical expenses for Robert and educational expenses for their children, as well as a certain $6,000 loss on an attempt to establish a luncheonette in 1959, the petitioners were unable to live within their means. Consequently, at various times prior to and during the year in issue loans were procured by the petitioners from the following lenders: Melrose Credit Union, Fraternal Credit Union, Hebrew Free Loan Society, Charles *51 "Ruby" Stein, I. Gelman, Bensonhurst National Bank, Bankers Trust Company, Rapid Loan Company, Commercial State Bank, and E. Pomerantz. On December 31, 1961, approximately $20,000 in loans were outstanding. In order to obtain funds from Melrose Credit Union, Fraternal Credit Union, Hebrew Free Loan Society and Charles "Ruby" Stein, it was necessary for the petitioners to furnish postdated checks to the lenders in weekly series. The terms of the other above-mentioned loans required payment in weekly, bi-weekly or monthly installments. During the taxable year 1962 the petitioners borrowed $17,180. This amount, together with the $3,750 gross income earned by Robert and the $4,784.80 net income after taxes earned by Sylvia, totals $25,714.80, which the respondent concedes was available for deposit inthe petitioners' bank account. [2]
*52 Since 1959 the petitioners have maintained a checking account at the Trade Bank and Trust Company (hereinafter referred to as Trade Bank) in their joint names. During 1962 the petitioners made deposits in this account totaling $239,281.55. The balance in the petitioners' checking account on December 29, 1961, was $1,412.22. The balance in the account as of December 31, 1962, was $7.49. In determining the deficiencies here in dispute the respondent used the bank deposits and cash expenditures method of reconstructing income. He added to the above-mentioned total deposits his determination of the petitioners' cash expenditures during 1962; i.e., $10,979.59 and deducted the amounts that he determined the petitioners had available for deposit from loans, salary and law practice. For the reasons we set forth above we have determined this latter amount to have been $25,714.80. This leaves the total amount of $224,546.34 unaccounted for. As we stated heretofore the respondent overestimated the petitioners' cash expenditures during the year by $5,579.59. [3] This 1432 further reduces the unaccounted for portion to $218,966.75; i. e., deposits of $239,281.55 plus $5,400 less $25,714.80. *53 At the beginning of 1962 the petitioners were heavily in debt. Throughout the year post-dated checks representing past loans, as well as other checks the petitioners had written to cover personal expenses and loans, were being presented to the Trade Bank for payment. In order to avoid being overdrawn at their bank the petitioners would avail themselves of the time lag between when a check is drawn and when it is ultimately presented for payment. The Trade Bank provided its depositors with a service whereby for a $1 service charge the depositor could bring in a check, bank draft, money order or cash and have it immediately credited to his account and thereby prevent an overdraft. The bank would also advise the petitioners as to the amounts needed to cover outstanding checks. The petitioners had four principal ways of utilizing this service and a myriad of less frequently used ways. In one way or another the petitioners would "kite" checks on an almost daily basis. Sylvia's mother, Bella, *54 during 1962 had a savings account at the City Savings Bank, now known as the Greater New York Savings Bank. During 1962 the average balance was approximately $3,000. When the petitioners determined that a deposit was necessary at Trade Bank they would draw a check upon their account at Trade Bank, payable to cash. Bella would then endorse the check payable to cash and Sylvia would then be permitted to cash the check at City Savings Bank using Bella's account there as security. City Savings Bank would then give Sylvia cash or a bank draft. Sylvia would then bring the cash or the bank draft to Trade Bank and have it immediately credited to her account to cover incoming checks. City Savings Bank would only cash up to $3,000 worth of petitioners' checks in this manner during any 10-day period. After 10 days the petitioners' checks would be considered cleared. In order to circumvent this rule Robert would obtain photostats of the petitioners' checks from Trade Bank which had been cleared. He would then bring this copy to City Savings Bank which would then reduce the amount of checks outstanding against Bella's account by the amount of the photostated check, thus making that much more *55 available to the petitioner. In this manner the petitioners cashed checks in the total amount of $123,532.20 at Bella's bank and deposited a like amount in their checking account at Trade Bank. The second major way in which petitioners would create deposits in their checking account was by purchasing American Express money orders, with checks payable to cash, from Jacob Wishner who operated a money order concession in a drug store. The petitioners could then deposit these money orders in their checking account. In this way the petitioners cashed checks for money orders in the total amount of $28,674.55. However, not all of this total was available for redeposit in the petitioners' checking account. Many of the checks with which the petitioners purchased money orders indicate that there was $.35 charge for the service. So out of a total of $28,674.55, $40.95 representing the cost of purchasing 117 money orders was not deposited in Trade Bank. Hence, $28,633.60 is the amount deemed deposited. The third method by which the petitioners obtained cash was when Sylvia did her grocery shopping on Saturdays. She would draw a check payable to cash for her grocery bill plus varying sums. *56 Her grocer, Four Brothers, would give her the cash excess which she would deposit on Monday in order to meet incoming checks. During 1962 Sylvia cashed checks in the total amount of $6,998.23, at Four Brothers. Of this amount $1,560 was expended for food leaving $5,438.23 available for redeposit in the petitioners' checking account. With the assistance of Frank Cutrone (hereinafter Cutrone), the proprietor of a liquor store and a friend of Robert's, the petitioners were able to obtain cash by a fourth significant method. In the evening Robert would go to the liquor store and Cutrone would cash a check for him giving him either cash or checks of customers. Robert would deposit in Trade Bank these amounts the following morning. In this manner the petitioners cashed checks in the total amount of $23,692.94 and deposited a like amount in their checking account. Sylvia had other less significant methods of "kiting" checks. Thus, during 1962 she would exchange rental checks collected by her employer for her checks made payable to the various landlords for whom her employer collected rents; i. e., Regal Gardens, Queen's Gardens and Ambassador Gardens. Sylvia would then find some way *57 1433 of leaving her office in order to deposit these checks in petitioners' account. Using this method the petitioners deposited $334 in their checking account. In addition Sylvia would obtain cash rentals from her employer and give the bookkeeping office her checks in exchange. In this way Sylvia made $318 available for deposit. At some time prior to the year in issue George Teichner, the petitioners' son (hereinafter referred to as George) lost some of his credit cards and charges were made against his accounts. George was threatened with suit by the issuers of the card. Subsequently, Robert settled the case for his son, arranging for a weekly payment schedule. During 1962 George would give his parents cash and they would then deposit the cash and issue checks to George's creditors. In this matter the petitioners made $861.43 available for deposit. The petitioners also obtained cash for deposit by paying various of Bella's expenses by check and then receiving cash payment from her. During 1962 the petitioners paid by check $5.50 for rental of Bella's safe deposit box at City Savings Bank; $799.55 to the New York City Collector for Bella's taxes; $307.80 to The Adams Coal *58 Company; $63.10 to I. Weisblum & Co. for Bella's homeowner's insurance and $91.81 to the Greater New York Savings Bank for the mortgage interest on Bella's home. By the various exchange methods detailed heretofore the petitioners made available for deposit $184,078.16. [4] This together with the amounts available for deposit as indicated on the petitioners' income tax return and the amount available from loans procured during 1962 aggregates $209,792.96 (i. e. $184,078.16 plus $25,714.80). The respondent in his statutory notice asserted that deposits of $239,281.55 plus cash expenditures of $10,979.59 were taxable to the petitioners in 1962. It is our finding that unexplained *59 deposits of $29,488.59 plus cash expenditures of $5,400 or $34,888.59 represents the amount taxable, out of the figures in dispute, to petitioners in the year 1962. During 1962 the petitioners failed to keep any intelligible books or records from which information, in addition to that heretofore described, in their aid could have been drawn. The respondent in his notice of deficiency, in addition to increasing the petitioners' income by $24,587.94, disallowed an interest expense deduction of $2,237.56 and a medical expense deduction of $272.60. Petitioners presented no evidence with respect to these disallowances. A negligence penalty was also asserted under section 6653(a). In their petition, in addition to replying to the above assertions of the respondent, the petitioners claimed an interest expense deduction of $2,500 which did not appear on their tax return for 1962. [5]
*60 Opinion In determining the major part of the deficiency here in issue the respondent employed the bank deposits and cash expenditures method of reconstructing income. Although, as set forth in our findings of fact, we made substantial adjustments in the respondent's determination, use of the bank deposits and cash expenditures method was justified. Section 6001 and the regulations issued pursuant thereto require taxpayers to "keep such permanent books of account or records * * * as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return * * *." Section 1.6001-1, Income Tax Regs. If books or records are not kept or are inaccurate or incomplete the respondent may resort to other means of determining income. Section 446(b): Holland v. United States, 348 U.S. 121 (1954), discussing application of the net worth method; Granat's Estate v. Commissioner, 298 F. 2d 397 (C.A. 2, 1962), affirming per curiam a Memorandum Opinion of this Court which applied the bank deposits method. 1434 When, as in the instant case, the petitioner has made numerous and comparatively large *61 deposits in a bank account, the sources and nature of which are not recorded or accounted for in any books of account, the Commissioner's determination of income and of deficiencies in tax thereon by reference to such deposits has been approved in numerous cases. Once the respondent has determined that unexplained deposits constitute income, the burden of proving that determination erroneous rests with the petitioner. John Harper, 54 T.C. 1121, 1129 (1970); Thomas B. Jones, supra at 614. In the instant case the petitioners sought to carry their burden of proof largely through their own testimony. The only helpful documentary evidence presented consisted of schedules of checks drawn by the petitioners during the year in issue, which were prepared by the respondent. [6]
The petitioners' explanation for the amount of their bank deposits during 1962 was in the main directed *62 at showing that the deposits were the direct result of checks drawn on the same account. The simplest example of this would be the cases in which Robert would purchase a money order by check and then deposit the money order to cover other outstanding checks that were soon to be presented for payment. It is of course manifest that the process would have to be repeated when the check written in payment for the money order was about to be presented for payment. By taking advantage of the time lag between the time a check was written until the time it was presented at the petitioners' bank, the petitioners were able to substitute new creditors for old without infusing a great deal of new money into their account. [7]
Our factual determination in this case was rendered quite difficult by the confusing nature of the record presented. There were several available witnesses who might have aided the petitioners' case. These persons for unknown reasons *63 were not called and we felt compelled to construe their absence against the petitioners. Stoumen v. Commissioner, 208 F. 2d 903, 907 (C.A. 3, 1953), affirming a Memorandum Opinion of this Court. We did, however, accept the petitioners' testimony insofar as that testimony could be corroborated by reference to the schedules of checks written by the petitioners during the year in issue. On the occasions when the petitioners could show that a particular check or category of checks had been written or cashed in order to redeposit the proceeds, we decreased the respondent's determination of unexplained deposits by that amount. In addition, we found the respondent's determination of the petitioners' cash expenditures to be excessive. Although, as we have set forth in detail in our findings of fact, we have substantially reduced the respondent's determination as to what constituted unreported taxable income to the petitioners there are instances in which the petitioners did not carry their burden of proof. The petitioners have failed to offer evidence sufficient to show that unexplained bank deposits and cash expenditures totaling $34,888.59 were not income from Robert's *64 practice of law or from some other source. See Goe v. Commissioner, 198 F. 2d 851, 852 (C.A. 3, 1952), affirming a Memorandum Opinion of this Court. As to these instances, application of the bank deposits and cash expenditures method is justified. The reconstruction of income is not invalidated "simply because the Commissioner erred in some of his choices as to what constituted income." Marcello v. Commissioner, 380 F. 2d 509, 511 (C.A. 5, 1967), affirming a Memorandum Opinion of this Court. On brief the petitioners argue that despite their considerable bank deposits their net worth did not increase during 1962. While it is true that the petitioners did not enjoy an increase in net worth this fact is irrelevant in the application of the bank deposits and cash expenditures method. Price v. United State, 335 F. 2d 671, 677 (C.A. 5, 1964). As we stated in our opening paragraphs the petitioners contest the respondent's 1435 disallowance of $2,237.56 of $3,072.56 deducted by the petitioners as interest expense. Due to the fact that the petitioners presented no evidence concerning this issue, they have failed to carry their burden of proof *65 and consequently we hold for the respondent. The respondent also disallowed a medical expense deduction of $272.60 claimed by the petitioners. Once again the petitioners failed to present any evidence concerning this issue. In addition to which it appears that due to the increase in the petitioners' adjusted gross income necessitated by our decision such deduction would be unavailable by virtue of section 213(a)(1). As we stated in our findings of fact the petitioners contend that they are entitled to an interest deduction of $2,500 for payments to Charles "Ruby" Stein which they failed to claim on their income tax return for 1962. Once again the petitioners have failed to offer evidence sufficient to carry their burden of proof. The only evidence adduced at trial was the rather vague and uncorroborated testimony of Robert that he engineered some sort of settlement of past debts that he owned to Stein. It is symptomatic of the quality of the petitioners' proof that even arithmetically the alleged settlement would not produce a $2,500 interest payment during 1962. If the petitioners had made 52 payments of $50 per week half interest and half principal, this would not produce $2,500 *66 in interest. Accordingly, we hold for the respondent. The final issue for decision concerns the respondent's determination of an addition to tax under section 6653(a). The burden of proving that respondent's determintion is erroneous rests on the petitioners. Peter Vaira, 52 T.C. 986, 1004 (1969). The respondent's determination that at least some part of the underpayment for 1962 "was due to negligence or intentional disregard of rules and regulations is presumptively correct." James S. Reily, 53 T.C. 8, 14 (1969). At trial the petitioners testified that Robert was unable to keep books and records due to his blindness. This was the only evidence submitted which would tend to disprove negligence. We hold that Robert's condition alone is not sufficient to exonerate the petitioners. Sylvia's vision was unimpaired and Robert, as an attorney, should have been well aware that it behooves the taxpayer to keep accurate books and records. In view of the petitioners' inability to satisfy their burden of proof we hold for the respondent. In order to reflect our adjustment of the respondent's determination of the petitioners' unreported taxable income, Decision *67 will be entered under Rule 50. Footnotes
1. All references by section are to the Internall Revenue Code of 1954 unless otherwise stated.↩
2. In his statutory notice the respondent stated that the petitioners had explained deposits of $25,673.20. The discrepancy between this figure and $25,714.80, although not explained by the parties, appears to be due to an arithmetical error. On brief the respondent describes Sylvia's earnings net after withholding as $4,732 or $4,743.20. It is our determination from the petitioners' income tax return and Sylvia's form W-2 that the amount was $4,784.80.↩
3. We have found that the petitioners' cash expenditures during the year amounted to $5,400; $125 monthly rent and $75 weekly for other expenses. $10,979.59 minus $5,400.00 equals $5,579.59.↩
4. Subsequent to trial, in a memorandum in support of their motion for further trial the petitioners raised the contention that the amount of their bank deposits should have been diminished by $3,063.20 because this amount represented checks deposited by the petitioners which were "dishonored." At trial and at a further hearing the petitioners offered no evidence in support of this contention; consequently, we did not adjust the amount of bank deposits as indicated on the petitioners' bank statements.↩
5. In support of this contention Robert testified that in the latter part of 1961 he was indebted to Ruby Stein, an indicted "loan shark" in the sum of $9,000 principal and interest. Petitioner also testified that he "made a settlement" with Stein whereby during a 100-week period running from November, 1961 to November, 1963 the petitioner would pay Stein $50 per week, half interest and half principal.↩
6. We note here that the respondent's counsel is to be praised for aiding the petitioners in every way possible during the conduct of this case. Appreciating that Robert was disadvantaged by his blindness, the respondent's counsel undertook to schedule over 2,000 checks in order to aid petitioners.↩
7. As we stated in our findings of fact the petitioners had several methods of accomplishing the same result. We have the example of the money order merely as an illustration in order to avoid a detailed recapitulation of the facts involved.↩