**A. Robert TEICHNER and Sylvia B. Teichner, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 217, Docket 71–1499.**

United States Court of Appeals, Second Circuit.

Argued Dec. 16, 1971.

Decided Jan. 5, 1972.

A. Robert Teichner and Sylvia B. Teichner, Brooklyn, New York, pro se.

Charles R. Burnett, Atty., Tax Div., Dept. of Justice, Washington, D. C. (Fred B. Ugast, Acting Asst. Atty. Gen., Meyer Rothwacks and Bennett N. Hollander, Attys., Tax Div., Dept. of Justice, Washington, D. C., on the brief), for respondent-appellee.

Before SMITH, KAUFMAN and MULLIGAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

We are called upon to decide whether appellants, A. Robert and Sylvia B. Teichner, husband and wife, satisfied their burden of proving that their bank deposits in 1962 totaling $239,281.55 were attributable to "check-kiting" and not unreported income. We find that this burden was met and accordingly reverse the ruling of the Tax Court that the Teichners owed income taxes in the amount of $12,825.05 and a penalty in the amount of $641.25.[1]

On their 1962 joint income tax return, the Teichners reported $3,750 as income from Mr. Teichner's law practice and $5,460 as Mrs. Teichner's salary income from her job as secretary for Jarc Realty. Claimed deductions (some of which were contested by the Commissioner) and exemptions reduced their reported tax liability to zero, and they sought a refund of $525.20, the sum that had been withheld from Mrs. Teichner's salary.

An IRS agent, conducting a routine pre-refund audit, undoubtedly believed he had stumbled on a huge tax evasion scheme when he discovered that the Teichners, with a reported gross income of less than $10,000, made deposits totaling $239,281.55 in their joint checking account at the Trade Bank and Trust Company in the same year. The Commissioner, unconcerned with the source of the money or to whom or where it flowed (the balance on December 31, 1962 was only $7.49), came to the only conclusion he believed logical—that the Teichners had been secreting reportable income. Using the bank deposits plus cash expenditures method of reconstructing income, the Commissioner found that the Teichners had received $224,587.99 in unreported income[2] and

---

1. The opinion of the Tax Court is reported at 29 T.C.M. 1430 (1970).

2. In using the bank deposit method for reconstructing income, the Commissioner added deposits ($239,281.55) to his estimate of cash expenditures ($10,979.59)

and then subtracted the income the taxpayers reported after withholding ($8,534.80) and non-income receipts such as loans ($17,180), which the Commissioner conceded could have been used to make the deposits and purchases. He then assessed a deficiency for the re-

notified them of a deficiency of $158,-226.19 and a penalty of $7,911.31.[3] This placed the burden on the Teichners to establish that the source of the deposits was not reportable income.[4]

■ The Teichners obviously had a good deal of explaining to do and they conscientiously tried to fulfill their burden. Both of them testified at the Tax Court hearing, and their uncontroverted testimony [5] painted a moving, sad and wholly believable tale of the frenetic activity in their checking account.

From the Tax Court record we learn that Mr. Teichner was admitted to the Bar of the State of New York in 1931. After their marriage in 1932, the Teichners moved into an apartment in a two-family house owned and occupied by Sylvia's mother, Bella Bloom. In 1945 Mr. Teichner's eyesight began to fail (by 1962, Mr. Teichner had been certified legally blind by a doctor), and by 1950 his law practice had dwindled to such an extent that he decided to conduct whatever limited practice was left from his apartment in Mrs. Bloom's two-family house. In 1953, faced with impending tuition costs of their two teenage children attending college and medical expenses occasioned in part by her husband's eye problems, Mrs. Teichner accepted employment as a secretary with Jarc Realty. In addition to the expenses to which we have referred, Mr. Teichner lost $6,000 in an unsuccessful attempt to establish a luncheonette, and by 1959 the Teichners were forced to do business with money lenders.[6] The Teichners periodically renewed many loans, sometimes in increasing amounts, and by January 1, 1962, they were approximately $25,000 in debt. Several lending institutions insisted that the Teichners give them their post-dated checks which these lenders then deposited *seriatim*. It was impossible on their meager income for the Teichners to cover these checks, meet the other payments due on outstanding loans and support themselves even in their modest manner of living. Yet, they steadfastly determined not to declare themselves bankrupt, a move, they testified, which would have injured several close friends who had guaranteed their loans. Instead, the Teichners developed their elaborate juggling act resembling a check-kiting scheme, which enabled them not to default on any payments and to stave off bankruptcy and resulting injury to creditors. By keeping checks totaling several thousands of dollars suspended "in the air" at any

maining "unexplained" deposits, which he erroneously calculated at $224,587.99 instead of $224,546.34. *See* 29 T.C.M. at 1431.

3. The Teichners petitioned the Tax Court for redetermination of the deficiency within the 90-day period required by 26 U.S.C. § 6213. This stayed the actual assessment and collection of the tax.

4. The government may rely on the "bank deposit plus cash expenditure" method without specific proof of the source of the outside income. The deposits themselves create the suspicion of outside sources of income; for the government to assess a deficiency and place the burden of proof upon the taxpayer there is no need to "link the bank deposit with an identified income producing activity." *See* Goe v. Commissioner of Internal Revenue, 198 F.2d 851, 852 (3d Cir.) cert. denied, 344 U.S. 897, 73 S.Ct. 277, 97 L.Ed. 693 (1952); *see also* Hague Estate v. Commissioner of Internal Revenue, 132 F.2d 775, 777 (2d Cir.) cert. denied, 318 U.S. 787, 63 S.Ct. 983, 87 L.Ed. 1154 (1943). *See generally* 2 J. Mertens, Law of Federal Income Taxation § 12.12 n. 58 (rev. ed. 1967).

5. Only Sylvia and Robert Teichner testified at the trial. Robert appeared *pro se* and on behalf of his wife. The government called no witnesses. It is interesting that the government also made no attempt to discredit the Teichners' testimony, nor did it assert a deficiency for any of the other years during which the Teichners' checking account showed large total deposits.

6. Among them were The Melrose Credit Union, the Fraternal Credit Union, the Hebrew Free Loan Society, Rapid Loan Company, the Bensonhurst National Bank, Bankers Trust Company, the Commercial Bank of North America, the Manufacturers Hanover Trust Company, First National City Bank, and the Greater New York Savings Bank.

given time, the Teichners avoided what they dreaded—a payee being told that Teichners had "insufficient funds."

In order to achieve this, however, Mrs. Teichner showed an extraordinary capacity to shuttle back and forth among banks, check cashers and lenders. For example, when Mrs. Teichner knew a check would be presented for payment against their account, she would present a check to an individual who would cash it immediately, whereupon she would deposit the cash to cover the previously written check being presented for payment. The benefits, of course, were short lived, because several days thereafter, the latest check for cash would be presented for payment, and Mrs. Teichner, to cover that one, would obtain additional cash by writing still another check. The process, repeated on almost a daily basis, was made possible because the Trade Bank, where the Teichners kept their account, maintained a "Special Immediate Credit Department." For a fee of one dollar, the Trade Bank would immediately credit cash deposits to cover shortages appearing in the account that day. Thus, the Teichners would telephone the bank each day to determine which checks had been presented for payment, and then would write new checks to obtain the necessary cash for deposit the same day thereby preventing an overdraft. This "merry-go-round" continued for Teichners, but the brass ring was always out of reach.

Accordingly, the tax audit not only revealed the substantial deposits to which we have referred, but, in addition, that more than 2100 checks for a sum totaling in excess of $240,000 had been drawn on the account. It is clear to us in light of uncontroverted testimony that the deposits represented the recycling cash and not newly earned, reportable and unexplained income. The checks drawn on their account which spawned the deposits and the deposits which created the funds for the checks were part and parcel of the same moneys. Thus, the deposits must be deducted in computing income on the basis of gross deposits under the bank deposits method. *See* John Harper, 54 T.C. 1121 (1970) ("corrections, redeposits or transfers" must be deducted).

Although the Tax Court applied this principle, it reduced the deficiency only in those instances where the Teichners could identify precisely the sources (their own checks) of specific deposits. The Teichners, after considerable effort, were able to document to the judge's satisfaction, the roll-over of $184,078.16.

In order to aid the Tax Court's determination, a government attorney prepared a schedule of all the disputed checks. We have no doubt that government counsel tried to be fair to the Teichners, but the detailed schedules appear to have confused the Tax Court by obfuscating the overall scheme. Thus, we observe that over 1500 checks were made out to cash and these were segregated into sub-groups of named endorsers. One group consisted of checks endorsed by Sylvia's mother, Bella, and three others consisted of checks endorsed by local merchants, Jacob Wishner, Frank Cutrone and Four Brothers Grocery. Into a fifth group went the remaining 400 checks payable to cash totaling $27,557.81, as well as over 600 checks payable to specific payees in amounts totaling $23,137.91.

At the Tax Court trial, the Teichners explained how they drafted checks merely to obtain cash for immediate deposit to cover previously written checks. For example, checks totaling $123,532.20 and endorsed by Bella were cashed by Mrs. Teichner at the City Savings Bank, where Bella maintained her account. Checks up to $3,000 in amount, the sum in Bella's account, would be cashed without question. Jacob Wishner, one of the local merchants, took a total of $28,633.60 of the Teichners' checks in exchange for American Express money orders, which Mrs. Teichner immediately deposited. Frank Cutrone, a liquor

store owner, and Four Brothers Grocery cashed the Teichners' checks as a favor.

In permitting the offset of the checks in these first four groups, Judge Sterrett did not require the Teichners to negate every other possibility—for example, that Mrs. Teichner may have used this cash to purchase jewelry or stashed it in a mattress or in a Swiss bank account and that the deposited money came from an undisclosed source to cover the checks. This likelihood, hopelessly implausible in light of the surrounding circumstances, could have led the Tax Court to accept in full the government's deficiency assessment. It is more reasonable to believe that if the Teichners had indeed received other reportable income, they surely would not have made the telltale deposits and withdrawals at the Trade Bank.

In the face of all this, Judge Sterrett found that $29,488.59 in Trade Bank deposits remained "unexplained" and consequently that the Teichners had not met their burden of establishing that they were not attributable to reportable income.

On the basis of the testimony adduced at the trial, we fail to perceive the difference between the checks endorsed by Frank Cutrone and Four Brothers, which Judge Sterrett allowed as deductions, and those, for example, endorsed by "C. Syms" or "Syms Haberdashery" which were not allowed. There were eighteen of these checks, totaling $5,357.35, all but one in round amounts. Surely, Robert Teichner, who was fighting to survive despite illness and financial reverses, did not go on a shirt buying spree.[7] Similarly, in the year 1962 "Snyder Drug Co. Inc." or "Stone & Snyder" cashed 28 of the Teichners' checks, and in the absence of anything

presented which would indicate the contrary, we are of the view that it is more reasonable to conclude that the Teichners did not spend $1,794.90 on drugs.[8] Accordingly, it appears to us that the link between the cash obtained from the checks in the fifth group and the ensuing deposits is not weaker than that between the checks found by the Tax Court to have produced the cash which went into Trade Bank account. Indeed, we are convinced by our own examination of the cancelled checks, deposit slips and bank statements, all of which are part of the record, that the deposits were generated in their entirety by loans, income which was reported and checks written on the Teichners' account, the proceeds of which were utilized as we have described, and that none resulted from unreported income.

The Teichners have adequately demonstrated "that a large part of [their] bank deposits were of items of a nonincome nature and that the balance was accounted for by income items already reflected in [their] records and returns." 2 J. Mertens, Law of Federal Income Taxation, § 12.12. See Pearl H. Jackson, 7 T.C.M. 507 (1948). The Tax Court, with little difficulty, reached the same conclusion in Zuckerman v. Commissioner, B.T.A. Decisions 35,469 [CCH Dec. 12,043–B] (1941), the only other reported "bank deposits" case we have been able to discover, in which the taxpayer contended that his bank activity resulted merely from a variation of a check-kiting scheme. In Zuckerman, petitioner operated a clothing store, reporting gross sales of $2,000 in 1935. His bank account, however, showed deposits of over $14,000. Zuckerman explained that his brother was in financial difficulty and frequently needed small

7. At oral argument, Mr. Teichner appearing for himself and his wife, explained that Mr. Syms was happy to exchange his cash receipts for Mr. Teichner's checks, because his store was located in a neighborhood where it was unsafe for storekeepers to keep large amounts of

cash at hand. Moreover, almost all the checks were in round numbers, reflecting the absence of a New York sales tax.

8. If they had, it is reasonable that they would have sought a much larger deduction for medical expenses.

loans for short periods of time. The two exchanged checks, but Zuckerman waited for a few days to deposit his brother's checks. The deposits clearly did not represent income, but merely the repayment of loans by his brother. (The brother's checking account must have been similarly active). This is precisely the situation we have here, but with more actors in the Teichners' fictional play and larger sums in transit. Living in their ill-conceived dreamworld, the Teichners effectively obtained short-term loans from whoever cashed their checks, and then "repaid" them when their checks cleared. To accept the decision that the Teichners had substantial unreported income in 1962 would be to accept a determination "which is plainly not consistent with the surrounding circumstances and which gives results absurd on their face." W. L. Harris, 7 T.C.M. 820, 826 (1948). We conclude that Judge Sterrett's finding was clearly erroneous.

Having determined that the Teichners had no unreported income in 1962, we still must consider their proper tax liability for that year. When the Commissioner asserted the deficiency based on his rigid and erroneous application of the bank deposits method, he also challenged deductions of $272.60 for medical expenses and $2,237.56 for interest paid. The Teichners, in their petition to the Tax Court, denied the deficiency, claimed the medical deduction was proper, and, in addition, asserted that they had failed to deduct $2,500 in interest paid to a loan shark, Ruby Stein, which they insisted they had a right to include in their 1962 return. They did not challenge the disallowance of another $2,237.56 in claimed interest payments.[9]

■ No doubt due to the enormity of the assessed deficiency, the Teichners spent little time at trial substantiating the relatively small claim for medical expenses. Nevertheless, examination of the checks to named payees revealed several checks payable to doctors and to the Associated Hospital Service.[10] These support the Teichners' claim that in 1962 they spent $100 for drugs and $370 for doctors' services and health insurance premiums. We are instructed by Cohan v. Commissioner of Internal Revenue, 39 F.2d 540, 543–544 (2d Cir. 1930) (L. Hand, J.) that, when a taxpayer has clearly demonstrated that some deductible expenses were incurred, he need not prove the precise sums to be entitled to an allowance of at least some deduction.[11] Moreover, we are convinced that the Commissioner did not disallow the claim because he believed the expenses had not been incurred, but because the Code permitted him to allow a deduction of only those medical expenses in excess of 3% of adjusted gross income. Int.Rev.Code of 1954, § 213 (the

9. The Teichners' 1962 return claimed that $2,237.56 in interest had been paid to the Melrose Credit Union. This apparently resulted from Mr. Teichner's misinterpretation of a letter from Melrose indicating the total amount of accrued interest—not necessarily paid in 1962—on the Teichners' accounts. At trial, the Teichners made no attempt to substantiate interest payments to Melrose.

10. There were six checks to the Associated Hospital Service, three in the sum of $42.75 and three for $39.60. These appear to be payments for insurance premiums.

11. *Cohan* itself dealt only with travel expenses. The Revenue Act of 1962, now Int.Rev.Code § 274, foreclosed application of the *Cohan* rule to travel and entertainment expenses. The Act did not, however, end its vitality with respect to the propriety of deducting other expenses. See Cummings v. Commissioner of Internal Revenue, 410 F.2d 675, 678 n. 11 (5th Cir. 1969); see generally, 9 J. Mertens, Law of Federal Income Taxation § 50.62 n. 32 (Rev. ed. 1967). ("This case is mentioned in almost every decision in which the amount of a deduction is in issue, the rule having become so well known that the citation is often omitted and reference is made only to the 'Cohan rule.'")

Teichners' expenses were much less than 3% of adjusted gross income as determined by the Commissioner). Accepting the Teichners' return as showing the correct adjusted gross income, we conclude that the $272.60 medical deduction should be allowed.

Finally, we cannot say that Judge Sterrett's determination that "petitioners have failed to offer evidence sufficient to carry their burden of proof" with respect to purported interest payments to Ruby Stein, is clearly erroneous. 29 T.C.M. at 1435. We agree that the Teichners cannot be penalized for failure to produce the cancelled weekly $50 checks to Mr. Stein. These checks were used as evidence in a trial at which Stein was convicted of income tax evasion and were retained in the custody of the government. Nevertheless, there is nothing but "the rather vague and uncorroborated testimony of Robert that he had engineered some sort of settlement of past debts that he owned [sic] to Stein." *Id.* No agreement showing a rate of interest or even demonstrating the enforceability of the obligation was placed in evidence.

In summary, we find that after disallowing the interest deduction of $2,237.56 and the Teichners' belated claim for a $2,500 deduction but allowing their claimed medical deduction, the Teichners' taxable income for 1962 is properly computed as $1,640.80. At the rates applicable for that year, the tax which should have been paid on this income is $328.16. *See* Int.Rev.Code of 1954, §§ 1, 2. Because $525.20 was withheld from Mrs. Teichner's salary, a refund of $197.04 plus interest is owing to the Teichners. *See id.* § 6611.

Reversed and remanded with directions that judgment be entered for appellants in the amount of $197.04 plus interest.