JOHN E. and KATHLEEN DAWN KRAUSE, n.k.a. KATHLEEN DAWN TRUITT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Krause v. Commissioner
Docket No. 2653-87
United States Tax Court
T.C. Memo 1991-13; 1991 Tax Ct. Memo LEXIS 13; 61 T.C.M. (CCH) 1670; T.C.M. (RIA) 91013; January 17, 1991, Filed *13 Decision will be entered under Rule 155. John E. Krause, pro se. John W. Ambrecht, for petitioner Kathleen Dawn Truitt. Irvin W. Fegley, for the respondent. PARR, Judge. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency in and additions to petitioners' Federal income tax as follows: Additions to Tax
Year
Deficiency
Sec. 6653(a)(1) [1]
Sec. 6653(a)(2)
Sec. 6651(a)(1)
1982
$ 33,489.00
$ 1,816.65
*
$ 8,372.25 By amended answer, respondent also determined that petitioners were liable for an addition to tax in the amount of $ 8,372.25 pursuant to section 6661. Petitioners concede they failed to report $ 39 in interest income. The issues for decision are: (1) Whether and to what *14 extent petitioners received embezzlement income in 1982; (2) Whether petitioners are entitled to claim partnership losses not claimed on their 1982 Federal income tax return; (3) Whether petitioners are liable for additions to tax under sections 6651(a)(1), 6661, and 6653(a)(1) and (2); and (4) Whether Kathleen Dawn Krause (now known as Kathleen Dawn Truitt) qualifies for innocent spouse relief under section 6013(e). For clarity, we will refer to Ms. Truitt as "Mrs. Krause" in discussing events during the years in issue. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts as between Mrs. Krause and respondent and attached exhibits are incorporated herein by this reference. Mr. Krause, who appeared pro se, never signed a stipulation of facts. There is considerable confusion surrounding the extent of Mr. Krause's participation in and agreement to a proposed stipulation attached to respondent's motion for an order to show cause. As to facts pertaining solely to Mr. Krause, most of the proposed stipulation relied heavily on deemed admissions from which Mr. Krause was relieved by the Court. In the interests of justice, we will *15 not, therefore, deem Mr. Krause to have entered into the stipulation to the extent it refers to and relies solely on deemed admissions. Mr. and Mrs. Krause resided separately in Carpinteria, California, at the time they filed their petition in this case. During 1982 and 1983 they were married and filed joint Federal income tax returns. Mr. Krause was an assistant manager at Lloyds BankCalifornia (Lloyds Bank) in Santa Barbara, California. Mrs. Krause was employed by Santa Barbara Bank & Trust, and for the most part, performed clerical duties. She attended Alan Hancock College in Santa Barbara, California, for two years and received an A.A. degree in general education. Petitioners had no tax withheld from their wages during the year in question. In the late 1970's real estate in Santa Barbara County was appreciating rapidly, and Mr. Krause was convinced that the purchase of real estate would be an excellent investment. He became a co-general partner in several limited partnerships with a Steven Shinn. Beginning in 1979 or 1980 the partnerships began buying and renting single-family, triplex, and four-plex houses. Mr. Krause eventually had interests in 18 or 19 properties. *16 Real estate rapidly became the most important thing in Mr. Krause's life. He testified: I just became obsessed with real estate. I lived, ate and breathed real estate. I worked my normal job at the bank, 40 hours or 45 hours a week. * * * I worked about another 40 or 50 hours a week on the properties. We [Messrs. Krause and Shinn] painted all our own; we cleaned all our own; we painted the inside of our own; we did all the maintenance repairs. I would get off work at the bank approximately 5:30 or so, if that was a clear night, we'd jump in the car and take off and go paint an apartment if it was empty.
Often Mr. Krause would not get home until 2:00 or 3:00 a.m., and he would leave again for work at 7:00 a.m. Mrs. Krause's many protests fell on deaf ears. Mr. Krause's addiction was out of control: If I bought two houses the first year, then I -- that means I had to buy four the second year, which I think I bought six the second year, * * * my biggest deal was $ 100,000. Well, you know, if I bought $ 100,000 in this month, that means I've got to buy $ 200,000 next month, and in the end, I was buying three apartment buildings at a time for a half *17 million bucks. * * * My next deal had to be a million dollar deal.
Most of Mr. Krause's income was plowed back into the real estate; the couple lived primarily on what Mrs. Krause earned. Mr. Krause periodically used family credit cards to purchase maintenance materials for his real estate investments, with the partnerships reimbursing some of these expenditures. Mrs. Krause wrote the checks for the household living expenses, but Mr. Krause was in charge of the partnership finances. Mrs. Krause had no involvement in the partnerships' bookkeeping or finances. Her only participation in the real estate venture was to sort mail and occasionally clean a house. She never participated in any of the real estate investment decisions. Several of the properties had second trust deeds, and all of these were operating with a negative cash flow. By late 1982 the partnerships were in serious financial trouble. Messrs. Krause and Shinn tried to sell additional shares of limited partnerships to obtain additional funds, but not enough money was raised. Desperate to pay off the mortgages in default, on January 4, 1982, Mr. Krause began embezzling money from Lloyds Bank by issuing *18 loans in the names of real persons who were unaware of the scheme. The loans were set up on a three-year monthly payment plan. As payments came due on previous loans, Mr. Krause would issue new false loans to make the payments and provide additional cash to keep other properties out of foreclosure. At the time of the embezzlement, three properties were in actual foreclosure, with payments required of approximately $ 25,000 plus fees, $ 18,000, and $ 8,000. Others were on the brink. Mr. Krause was still hoping to get enough new partners to be able to repay the bank; that way, the bank would never know the money was missing, and the partners would have ongoing properties. From January 4, 1982, until July 8, 1982, Mr. Krause embezzled approximately $ 82,000. He gave $ 60,000 to Mr. Shinn, in various increments, to avoid foreclosures, and returned $ 22,000 to the bank to repay the fictitious loans. Mr. Shinn used approximately $ 26,000 for the intended purpose. The remainder is unaccounted for. Although the issue is not free from doubt, we find that Mr. Shinn retained these funds for his own use. Had the embezzled funds been used to pay off the second mortgages, almost all the *19 properties would have had a positive cash flow from the rents. Most of the properties had been purchased with 10- to 25-percent downpayments, so that even the ones which might still have had a negative cash flow would have been covered by the positive cash flow of the others. No embezzled funds were deposited in petitioners' personal accounts. Mr. and Mrs. Krause's standard of living did not increase. Mrs. Krause did not know of, nor was she involved in any way in, the embezzlement scheme. In mid-August 1982 Lloyds Bank performed an audit. The auditors did not discover the fraud. But Mr. Krause, who was a deeply religious man, could no longer bear the mental and physical stress of continuing the deception. He voluntarily confessed to the auditors, showed them all the records of the fraudulent loans, and gave them a written statement. Two hours later he was fired. Several days passed before Mr. Krause found the courage to tell his wife he had been fired. She was emotionally fragile and prone to weeping; she had cried herself to sleep every night for a year and a half after the death of her father. For this reason, Mr. Krause hesitated to confide in her. When he did tell *20 her, she felt humiliated and betrayed, and would not listen to the details of what had happened. She continued to become emotionally upset whenever the subject was raised. Mrs. Krause did not attend the indictment and did not know the amount taken until she attended Mr. Krause's sentencing hearing. At the time of the embezzlement, both petitioners were very active in their church community. In fact, before signing the written confession for the bank Mr. Krause tried to talk to his pastor. Within a few days Mr. Krause revealed his situation to a church friend, Chuck Pirschel, who offered him a job making screens in his glass shop. Because of his wife's inability to listen to his pain and her difficulty in forgiving him, Mr. Krause found greater comfort in talking with Mr. Pirschel and his wife, Jan, than with Mrs. Krause. He openly acknowledged his wrongdoing to close church friends, and the church community was supportive and forgiving. [2] He did not try to keep secret the amount embezzled, which he thought was $ 60,000. *21 In October 1982 the FBI brought charges. On January 19, 1983, Mr. Krause pled guilty to misapplication of bank funds in the amount of $ 15,000. On March 14, 1983, he was sentenced to one year and one day in prison, a suspended sentence of five years, and five years' probation. As a condition of probation Mr. Krause was ordered to repay the bank $ 15,000, which he did, presumably in 1983. Mr. Krause began serving his jail sentence on April 4, 1983, and was released on December 23, 1983, for good behavior. When Mr. Krause was fired, Mr. Shinn's role took on new significance. Until mid-1982 partnership bank statements and rents came to Mr. Krause at his home. Mrs. Krause was not involved in any of this paperwork, except to place the unopened envelopes in a box for her husband. After August, all rent payments went to Mr. Shinn. The partnerships operated under the names of Steven T. Shinn and John E. Krause A, B, C, D, etc. The original agreement was that Mr. Shinn would handle the paperwork and Mr. Krause would do the promoting. Mr. Shinn would keep the checkbooks and track the monies. Mr. Krause would receive the rents and tell Mr. Shinn which property should be credited. *22 As the operation grew, in mid-1982 the partners hired a bookkeeper, Sandra McMurrey. Mr. Shinn continued to balance the checkbook. After Mr. Krause was fired, Mr. Shinn told him the other partners had lost faith in him and wanted Mr. Shinn to take over as the sole managing partner. Mr. Krause agreed, because it relieved him from a lot of pressure, he wanted to pacify the limited partners, and he trusted Mr. Shinn. But almost immediately several of the limited partners filed suit against Messrs. Krause and Shinn for the return of their money. As a result, in September 1982 Mr. Shinn placed the properties in bankruptcy. After that, no further payments were made on the loans, even though rents sufficient to cover the payments should have been coming in. At that time there were around 10 properties with tenants paying between $ 425 and $ 550 per month. The rents were sent to Mr. Shinn. But this money, which should have been available to pay off the limited partners, disappeared. We find that rental income of $ 5,000 per month for four months in 1982, or $ 20,000, vanished. Mr. Shinn did not remit the rent payments to the bankruptcy trustee or deposit them in the partnership *23 bank account. He never accounted for them to the limited partners, to the bankruptcy trustee, or to the Assistant District Attorney who prosecuted Mr. Krause. An additional $ 18,000, proceeds from a property sale above the encumbrances, was neither distributed to the partners nor accounted for. [3] As soon as the bankruptcy proceedings were completed, Mr. Shinn left town. Petitioners did not receive any of the missing rent or sale proceeds. Mr. Krause began to suspect by the end of 1982 that Mr. Shinn was illegally taking his and the limited partners' money, because the rent proceeds, which should have covered the mortgage payments, were not being applied to partnership debts. Eventually all but one of the properties *24 were sold in bankruptcy. In the one exception, title was transferred from Mr. Krause and Mr. Shinn to the other partners or would-be partners for no cash. Mr. Krause recovered only $ 1,000 from the bankruptcy sale even though he had invested thousands of dollars in the partnerships, including $ 60,000 of the embezzled funds. Mr. Shinn, who was a 50-percent partner, claimed to have lost $ 100,000 in 1982 and 1983, which he deducted on his own individual income tax returns for those years. However, Mr. Shinn's returns were not in evidence, and he was unable to testify with specificity how the losses were apportioned between the years. He too ultimately received only $ 1,000 from the sale of the properties plus $ 400 from his personal bankruptcy. For each year prior to 1982, because of depreciation and other deductions connected with the real estate partnerships, petitioners did not owe any individual income taxes. This was the reason they had not had income taxes withheld by their employers in 1982. They did not claim such deductions in the year in issue, however. Because of Mr. Krause's difficulties and subsequent imprisonment (and Mr. Shinn's disappearance), partnership returns *25 were not filed for 1982 until late 1984 or 1985. After his release from prison, Mr. Krause took the partial records he was able to retrieve from the District Attorney to H & R Block, who prepared the partnership returns. Thus, no Shinn-Krause partnership losses were claimed on petitioners' 1982 individual income tax return, nor was an amended return ever filed. The partnership returns for 1982 and 1983 (which are not in evidence) may have shown some gains on the final sale of at least some of the properties, even though almost no cash was realized. On the other hand, petitioners may have been entitled to depreciation and other expense deductions. We have no way of knowing, without the records or the partnership returns. The $ 60,000 which is being charged to petitioners as income (infra p. 15) was never credited to Mr. Krause's capital account. During and after Mr. Krause's imprisonment, Mrs. Krause worked two jobs and overtime at Santa Barbara Bank to pay off petitioners' debts, particularly credit card loans run up to pay partnership expenses. She sewed her own clothes, drove an old car, and was very thrifty. She also took in a roommate to help with expenses while Mr. *26 Krause was in prison. Unlike Mr. Shinn, petitioners did not declare personal bankruptcy. Instead, they made extraordinary efforts to pay off their debts; these efforts were continuing at the time of trial. Petitioners filed two requests for extensions of time to file their 1982 Federal income tax return. One extension lasted until August 15, 1983; the second expired October 17, 1983. In connection with Mr. Krause's indictment, the District Attorney had subpoenaed and held twelve boxes of documents, containing all of petitioners' financial records. After he was released from jail, Mr. Krause tried to retrieve all the subpoenaed documents, but only five boxes were found and returned. On April 15, 1984, Mr. Krause took all the available records to H & R Block to have the 1982 and 1983 individual joint returns prepared. Mr. Krause told the return preparer that he had just been released from prison for embezzlement. The return preparer added a note to the 1982 return giving Mr. Krause's imprisonment as the reason for the delay in filing. The return preparer did not ask the amount of the embezzlement or suggest it be reported as income. Mr. Krause did not think he was required *27 to report the amount, since all the money had either been lost or repaid. Mrs. Krause did not participate in filling out petitioners' tax return. Her only involvement was to give Mr. Krause her W-2 forms and receipts for charitable contributions and interest payments. Because the returns were not completed by the preparer until late in the evening of April 15, 1984, Mrs. Krause signed the completed return without reviewing it. She did not know the embezzled income was excluded from the return. Of the $ 82,000 in embezzled income, $ 60,000 was not repaid to Lloyds Bank in 1982, although $ 15,000 more was repaid in 1983. No embezzlement income was reported on petitioners' 1982 tax return. Mr. and Mrs. Krause tried to rebuild their marriage after Mr. Krause's release from prison. In February 1988 Mrs. Krause loaned Mr. Krause $ 25,000 from an inheritance, to help with a business they intended to start together. However, at the time of trial petitioners were obtaining a divorce. OPINION Embezzlement Income
Gross income includes funds obtained by embezzlement. To the extent the victim (here, the bank) recovers the misappropriated funds, there is a reduction in the embezzler's *28 income. James v. United States, 366 U.S. 213, 220, 6 L. Ed. 2d 246, 81 S. Ct. 1052 (1961). Mr. Krause embezzled $ 82,000, of which he returned $ 22,000 in 1982. Our finding of the amount returned is based on the testimony of Mr. Krause, which we found highly credible. His claim that he received only $ 60,000 is consistent with his admissions to his pastor and church community at the time. It is also consistent with the "ball-park" amounts due for mortgages, penalties, and fees on properties on which foreclosure was imminent during the period of the embezzlement. All of the evidence shows that, except for the real estate partnerships, petitioners lived frugally. Neither undertook any unusual personal expenditures during this time, even by credit card, because their credit was stretched to the breaking point. Petitioners' standard of living did not improve. If petitioners had retained money for their personal use, there would be some evidence of it. There is none. To the extent respondent relied on his stipulation of facts with Mrs. Krause to establish the amount of the embezzlement, that reliance is misplaced. Paragraphs 24 and 25 of the stipulation, the only "evidence" presented by respondent to rebut *29 Mr. Krause's testimony on the issue of the amount returned to the bank, reads rather ambiguously as follows: 24. Between petitioner Kathleen Dawn Krause and Respondent, it is not disputed that $ 77,500.00 of the aforesaid $ 82,000.00 was not returned to Lloyds Bank during 1982. 25. Between petitioner Kathleen Dawn Krause and Respondent, it is not disputed that if not exactly, then approximately $ 77,500.00 of the aforesaid $ 82,000.00 was not returned to Lloyds Bank during 1982.
We take this to mean only that respondent and Mrs. Krause agree that Mrs. Krause does not know how much money was returned to Lloyds Bank, and therefore Mrs. Krause has no basis on which to dispute respondent's contention. This is consistent with all the testimony in the case to the effect that Mrs. Krause knew nothing about the embezzlement. Further, we relieved Mr. Krause of deemed "stipulations" based upon his deemed "admissions." He credibly testified that he gave $ 60,000 to Mr. Shinn to stave off foreclosure on their properties, and that the remainder of the embezzled money was returned to the bank as payments on earlier false loans as they came due. We accept this *30 testimony as true. Therefore, petitioners received $ 60,000 embezzlement income in 1982, which must be included in gross income. Unclaimed Losses
Of the $ 60,000 given to Mr. Shinn, $ 26,000 was applied to real estate on behalf of a Shinn-Krause partnership. Although Messrs. Shinn and Krause ended up with only $ 1,000 each, we do not have sufficient information to even estimate whether, or how large, a loss was sustained on the dissolution of the partnerships and sale of the properties. Compare Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). We do not know, for instance, any of the following: Mr. Krause's basis, the purchase and sale prices of the houses, depreciation previously claimed, whether it had to be recaptured, or expenses of sale. We do not know what percentage of the various partnerships was allocable to Mr. Krause. Therefore, for lack of proof by petitioners, who bear the burden of proof, we cannot find that petitioners are entitled to any losses connected with the real estate partnerships. On the other hand, we found that Mr. Shinn did not apply the entire $ 60,000 to partnership expenses, but instead retained $ 34,000 for his personal use. Mr. Krause *31 testified that he gave large amounts of cash to Mr. Shinn on three occasions. Mr. Shinn denied that he received anything more than a single payment of $ 26,000. We accept the testimony of Mr. Krause. We make this finding based upon our observation of the demeanor of each witness. Mr. Shinn was evasive, "forgetful," and unable to explain what happened to large amounts of money entrusted to him. The rents he collected on behalf of the partnership were never turned over to either the bankruptcy court or the other partners. Mr. Shinn was not able to explain these discrepancies on the stand. The theory that a theft occurred is consistent with other facts concerning Mr. Shinn's lack of accountability. For instance, the Deputy District Attorney testified that $ 18,000 in proceeds from the sale of one house remained unaccounted for and was never distributed to the other partners nor to the bankruptcy referee. We also note that Mr. Shinn declared bankruptcy on behalf of the partnerships and himself almost immediately after Mr. Krause was removed as managing partner. But if the funds had been applied to the real estate as Mr. Krause intended, there should have been a positive cash *32 flow and thus no reason to declare bankruptcy. [4]
Normally we do not consider theories not raised in the pleadings or briefed by the parties. Until trial, Mr. Krause's theory of the case was simply that he was entitled to unclaimed partnership losses attributable to the real estate. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Rule 41(b)(1). Respondent was the party who called both Mr. Shinn and the Deputy District Attorney. We deem him to have consented to issues raised by their testimony. Therefore, in the interests of justice, we now consider whether Mr. Krause is entitled to claim a theft loss. A loss arising from theft is allowable as a deduction under section 165(a) for the taxable year in which the taxpayer discovers *33 the loss. See sec. 1.165-8, Income Tax Regs. Mr. Krause discovered the loss in 1982; thus, if the loss qualifies as a theft it is deductible in the year in issue. Whether a loss from theft occurs depends upon the law of the jurisdiction where it was sustained. Edwards v. Bromberg, 232 F.2d 107 (5th Cir. 1956).Under California law, Every person who shall feloniously steal, take, carry * * * away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money * * * is guilty of theft. * * * [Cal. Penal Code sec. 484(a) (West 1988)].
Mr. Shinn took $ 34,000 from Mr. Krause under false pretenses. He led Mr. Krause to believe he would pay partnership bills, but kept the money instead. Theft includes larceny, embezzlement, or robbery. Sec. 1.165-8(d), Income Tax Regs. See also Cal. Penal Code sec. 490a (West 1988). Regardless of how we characterize Mr. Shinn's actions, we believe a "theft" occurred under California law. Here, two crimes coexist. Mr. Krause was guilty of embezzlement, *34 and for income tax purposes we attribute the embezzled $ 60,000 to him. He was also the victim of a theft. Mr. Shinn's plan was separate and distinct from the plan whereby Mr. Krause diverted funds from Lloyds Bank. In Arc Electrical Construction Co. v. Commissioner, T.C. Memo 1988-592, supplemented by T.C. Memo 1990-30, we held that a corporation that itself committed fraud was at the same time a victim of an embezzlement. At the time of the second theft, Mr. Krause was in possession of the funds. In California, "ownership" and "possession" are synonymous when considered as an element of theft. People v. Kirsch, 204 Cal. 599, 269 P. 447 (1928), citing People v. Edwards, 72 Cal. App. 102, 236 P. 944, 950 (1925); Cal. Penal Code sec. 490a (West 1988). See also People v. Price, 46 Cal. App. 2d 59, 115 P.2d 225 (1941). Petitioners are therefore entitled to a theft loss deduction of $ 34,000. [5]
*35 Additions to Tax
Section 6651(a)(1)
Section 6651(a)(1) imposes an addition to tax for a taxpayer's failure to file a required return on or before the specified filing date, including extensions. The addition to tax may be avoided, however, if the taxpayer can show that the failure to file the return was due to reasonable cause and not due to willful neglect. Sec. 6651(a)(1); Richardson v. Commissioner, 72 T.C. 818, 827 (1979).The burden of proof is upon petitioners. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933). Petitioners reported their income on the basis of the calendar year; therefore, their return for 1982 was due April 15, 1983. See sec. 6072(b); sec. 1.6072-1(a), Income Tax Regs. However, two extensions were filed extending the due date until October 15, 1983. Despite the extensions, petitioners still filed their 1982 return six months late, April 15, 1984. Petitioners testified they were unable to file a timely 1982 return because the District Attorney was holding the partnership records. Mr. Krause was in prison when the return was due, which unquestionably presented some difficulty in his preparing a return. But incarceration, standing alone, *36 is not reasonable cause for failing to file a timely return. Llorente v. Commissioner, 74 T.C. 260, 268-269 (1980), affd. in part and revd. and remanded in part 649 F.2d 152 (2d Cir. 1981).We also note that Mr. Krause was released from prison December 23, 1983, but did not file the return until the following April. Moreover, Mrs. Krause, who was not in prison and had an equal responsibility to file, failed to do so. Although we recognize that she was under a great deal of pressure and emotional strain at the time the return was due, she was able to hold down two jobs and to meet her other obligations. We think that by October 15, 1983, when the second extension expired, Mrs. Krause would have been able to take the couple's W-2 forms, interest receipts, and similar records (which she maintained) to a return preparer. Moreover, Mrs. Krause never attempted to obtain the records from the District Attorney, nor was she ever told she could not obtain them. We also note that the return which was eventually filed appears not to rely on information that would have been held by the District Attorney, since it contains no references to the Shinn-Krause partnerships or to the embezzled *37 funds. Accordingly, petitioners have not established that their failure to timely file their 1982 Federal income tax return was due to reasonable cause and not due to willful neglect. We sustain respondent's determination that petitioners are liable for the section 6651(a)(1) addition to tax for 1982 attributable to the amount of tax required to be shown on the return. Section 6661
Since respondent raised this issue by amendment to answer, he bears the burden of proof. Rule 142(a). With certain exceptions, section 6661 imposes an addition to tax of 25 percent of any underpayment attributable to an understatement of income tax, if the understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Pallottini v. Commissioner, 90 T.C. 498 (1988). The amount of the understatement shall be reduced by the portion attributable to "any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return." Sec. 6661(b)(2)(B)(ii). We have considered whether the statement attached to petitioner's return provides such "adequate disclosure." The *38 statement reads, in its entirety, as follows: Taxpayer is filing this return late due to his records being held by District Attorney's office and he had no access to them.
Although we found as a fact that this statement is additional evidence which supports Mr. Krause's testimony that he told his return preparer of his embezzlement, we conclude it did not adequately inform the IRS of the embezzlement or the treatment, or lack thereof, on the return. Since there is no substantial authority that supports petitioners' failure to report their embezzlement income, and they failed to adequately disclose the item's tax treatment, petitioners are liable for the addition unless some or all of the addition to tax should have been waived by respondent. See sec. 6661(c). Petitioners argue that they reasonably relied on professional advice and acted in good faith and, therefore, come under the protection of section 1.6661-6(b), Income Tax Regs. Their reliance is misplaced. The appropriate standard of review for section 6661 is whether respondent has abused his discretion. As we said in Mailman v. Commissioner, 91 T.C. 1079, 1083-1084 (1988):
The issue *39 here is not whether petitioner's conduct satisfies the conditions for imposing the addition to tax. Those conditions have been satisfied. The issue is whether petitioner's liability should have been waived by respondent. Unlike other additions to tax such as for failure to timely file (Sec. 6651(a)(1)), the statute does not provide that the taxpayer's proof of reasonable cause will excuse the taxpayer's misfeasance. Rather, section 6661(c) provides that if liability under the statute is otherwise imposed, respondent may waive imposition of the addition to tax in cases in which respondent determines that the taxpayer's failure had a reasonable cause or was premised on good faith. * * * We find that respondent did not abuse his discretion in denying a waiver of the addition to tax. It was not unreasonable for respondent to refer decisions as to the credibility of petitioners' oral testimony to the finder of fact. Respondent will have met his burden of establishing the prerequisites for liability for this addition if the amount of the understatement, as redetermined under Rule 155 in accordance with this opinion, exceeds the greater of 10 percent of the tax required *40 to be shown on the return or $ 5,000. Section 6653(a)(1) and (2)
If any part of any underpayment is due to negligence or intentional disregard of rules or regulations, there shall be added to the tax an amount equal to 5 percent of the underpayment. Sec. 6653(a)(1). An additional amount is added to the tax under section 6653(a)(2), equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence. Petitioners mistakenly failed to include their income from embezzlement. They did not claim any losses, either from theft or in connection with their partnerships, although they believed they had lost thousands of dollars. We think petitioners attempted to file an accurate return, and that it did not occur to them to report the embezzled funds which, by April 1984, had been either repaid ($ 22,000 in 1982 and $ 15,000 in 1983), stolen, or lost through foreclosure. We are convinced that petitioners were making every possible effort to obey the law. Mr. Krause had been received warmly back into his church community, and was determined to rebuild his marriage and his life. Both petitioners had suffered a great deal from Mr. Krause's *41 crime, and wanted to do nothing that would cause his parole to be revoked. We do not believe he would have intentionally done anything he knew to be wrong at that time. We accept Mr. Krause's testimony that he informed his professional income tax preparer of the embezzlement (which fact is partially evidenced by the note attached to the return, explaining that the return is late because the District Attorney has the records), and were not advised to report the income. Under the circumstances herein, we decline to hold petitioners liable for the addition to tax for negligence. Innocent Spouse
Finally, we consider whether Mrs. Krause is entitled to innocent spouse relief under section 6013(e). A husband and wife who file a joint return are jointly and severally liable for the tax due. Sec. 6013(d)(3). However, an "innocent spouse" is relieved of liability if he or she proves that: (1) a joint return has been made for the tax year in question; (2) the return contained a substantial understatement of tax attributable to grossly erroneous items of the other spouse; (3) he or she did not know of, and had no reason to know of, the substantial understatement when he or she signed *42 the return; and (4) after consideration of all the facts and circumstances, it would be inequitable to hold him or her liable for the deficiency in tax attributed to such substantial understatement. Sec. 6013(e)(1). Mrs. Krause bears the burden of establishing that each of the requirements of section 6013(e) has been satisfied. Bokum v. Commissioner, 94 T.C. 126, 138 (1990).Failing to establish any one of these requirements will prevent her from qualifying for relief under section 6013(e). Stevens v. Commissioner, 872 F.2d 1499, 1504 (11th Cir. 1989), affg. a Memorandum Opinion of this Court; Purcell v. Commissioner, 826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986). There is no dispute petitioners filed joint Federal income tax returns for the year in question. Although we cannot tell without a recalculation under Rule 155, we will assume for these purposes that the return contained a "substantial understatement of tax" attributable to the omission of the embezzled funds, i.e., a grossly erroneous item of Mr. Krause. See sec. 6013(e)(2) and (3). However, the parties disagree whether Mrs. Krause established that she neither knew nor had reason to know *43 of the substantial understatement in issue. They also disagree as to whether it would be inequitable to hold Mrs. Krause liable for the deficiencies and additions attributable thereto. Since an appeal in this case would lie with the Ninth Circuit Court of Appeals, we look to the law of that Circuit to decide whether Mrs. Krause is relieved from liability. Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971). In the Ninth Circuit, the "reason to know" test is given a broader reading in cases involving erroneous deductions than in omission cases. Guth v. Commissioner, 897 F.2d 441, 444 (9th Cir. 1990); Price v. Commissioner, 887 F.2d 959, 963-964 (9th Cir. 1989).Since this case involves the erroneous omission of income, rather than an erroneous deduction, the Ninth Circuit would apply the stricter test adopted by this Court and approved by the Eleventh, Sixth, and Seventh Circuit Courts of Appeals. See Guth v. Commissioner, supra at 444. The test for determining whether a spouse knew or had reason to know of the substantial understatement in omission of income cases is whether a reasonably prudent taxpayer in his or her *44 position at the time he or she signed the return knew or could be expected to know of the underlying transactions leading to the understatement of tax. Stevens v. Commissioner, supra;McCoy v. Commissioner, 57 T.C. 732 (1972). Ignorance of the tax consequences of the item which gives rise to a deficiency is of itself an insufficient defense for one seeking innocent spouse relief. Harsh as it may seem, once Mrs. Krause knew of embezzlement activity, whether or not she knew embezzlement income was reportable on the return is immaterial under section 6013(e). See Stevens v. Commissioner, supra at 1505 n.8; Purcell v. Commissioner, supra.See also Quinn v. Commissioner, 524 F.2d 617, 626 (7th Cir. 1975), affg. 62 T.C. 223 (1974); McCoy v. Commissioner, supra at 734. [6]
Mrs. Krause does not qualify for relief because when she signed the return Mrs. Krause knew that the embezzlement had occurred. Indeed, she does not contend otherwise. *45 She does argue that her mental state precluded her knowledge of the amount of the embezzlement. Whether or not true, this is immaterial. Mrs. Krause certainly knew that some amount had been embezzled. She was functioning well enough to hold down more than one job and to meet her personal obligations. Her life had been turned upside down by the embezzlement, and we are certain she was very well aware of it. She also knew or had reason to know that none of Mr. Krause's embezzlement income was reflected on petitioners' 1982 tax return. The fact is, the income was omitted simply because neither petitioner knew such income was required to be reported. Mrs. Krause has not established her lack of knowledge, and therefore cannot qualify as an "innocent spouse." For completeness, however, we examine whether it would be inequitable to hold Mrs. Krause liable for the deficiency and additions to tax. We believe that, under the circumstances, it would be inequitable. Although both spouses were ignorant of the tax consequences, this is not a case in which both parties are equally "innocent." Compare McCoy v. Commissioner, supra at 734. Here, Mr. Krause was guilty of embezzlement *46 and concealment of the embezzlement. Mrs. Krause knew nothing about it. Moreover, she did not benefit in any way from the embezzlement; in fact, she was grossly harmed by it. She was embarrassed and humiliated and might have lost her own job. She was forced to take on overtime and a second job. She had to take in a roomer. Her marriage was eventually destroyed. Nevertheless, because Mrs. Krause "knew or should have known" of the underlying circumstances concerning the embezzlement, under the current state of the law she does not qualify for relief. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the taxable year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest due on the deficiency.↩
2. This church support for both petitioners continued during and after Mr. Krause's imprisonment.↩
3. The Assistant District Attorney who investigated charges of securities fraud against Mr. Krause never asked Mr. Shinn to account for the rents. She accepted his unsupported statement that he was unable to account for the missing $ 18,000. Mr. Shinn himself was never the target of any investigation.↩
4. We recognize that Mr. Shinn was never the focus of a criminal investigation, but that may have been because once Mr. Krause pled guilty the case was closed.↩
5. Petitioners are not entitled to deduct the stolen rents or the $ 18,000 in proceeds from the sale of property, since these proceeds belonged to the partnerships. As stated above, we lack sufficient information to calculate the partnership losses, if any, attributable to petitioners.↩
6. See also Malandro v. Commissioner, T.C. Memo 1989-135↩.