T.C. Memo. 1997-513


UNITED STATES TAX COURT


MAURICE D. AND ELINOR TAYLOR, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 5218-95.                    Filed November 17, 1997.


<u>Paula M. Junghans</u> and <u>Caroline D. Klepper</u>, for petitioners.

<u>Richard A. Stone</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, <u>Judge</u>: Respondent determined the following deficiencies, additions, and penalties with respect to petitioners' Federal income taxes:

| | | Additions to Tax & Penalties | | |
| | | Sec. | Sec. | Sec. |
| Year | Deficiency | 6651(a)(1) | 6653(b)(1) | 6663 |
| 1988 | $178,198 | --- | $133,649 | --- |
| 1989 | 40,454 | $10,114 | --- | $30,341 |
| 1990 | 36,405 | 9,101 | --- | 27,304 |

Respondent seeks, in the event the Court does not sustain the fraud determination for 1988, additions to tax for negligence or disregard of rules or regulations pursuant to section 6653(a)(1), substantial understatement of tax pursuant to section 6661(a), and failure to timely file a Federal tax return pursuant to section 6651(a)(1). Additionally, in the event the Court does not sustain the fraud determinations for 1989 and 1990, respondent seeks accuracy-related penalties pursuant to section 6662 for negligence or disregard of rules or regulations or substantial understatement of tax.

The 1988 deficiency arises from respondent's determination that petitioners had unreported income from a grocery/convenience store business, a jewelry business, a check-kiting scheme, an individual retirement account distribution, and interest from bank accounts. The 1989 deficiency arises from unreported income of the grocery/convenience store business and from gambling, and the 1990 deficiency arises from unreported income of the grocery/convenience store business, gambling winnings, and interest. For all 3 years in issue, deficiencies were also determined for failure to report self-employment taxes with respect to the unreported income from petitioners' business activities.

After concessions,[1] the following issues remain for decision: (1) Whether Maurice D. Taylor (petitioner) received $280,698 (or any lesser amount) of income from a check-kiting scheme in 1988;[2] (2) whether petitioner is liable for the fraud addition to tax pursuant to section 6653(b)(1) for 1988 and fraud penalties pursuant to section 6663 for 1989 and 1990; (3) whether Elinor Taylor (Mrs. Taylor) is entitled to innocent spouse relief pursuant to section 6013(e) for each year in issue; and (4) in the event the Court does not sustain respondent's determinations of the fraud addition to tax or penalties, whether petitioners are liable for additions to tax or accuracy-related penalties for negligence, substantial understatement, and failure to file.

All section references are to the Internal Revenue Code as in effect for the years in issue, unless otherwise indicated. All

---

[1] The parties stipulate that petitioners had net income from the grocery/convenience store business of $72,919 in 1988, $102,370 in 1989, and $87,877 in 1990. Respondent concedes that petitioners had no net income from the jewelry business and that Mrs. Taylor is not liable for the fraud additions to tax and penalties. Petitioners concede respondent's determinations with respect to the individual retirement account distribution, interest income, and gambling winnings. Petitioners further concede that the net income from the grocery/convenience store business is subject to self-employment taxes for each year in issue. Finally, petitioners concede that they are liable for the additions to tax for failure to timely file their 1989 and 1990 Federal income tax returns pursuant to sec. 6651(a)(1).

[2] In the notice of deficiency, respondent determined unreported income of $300,698 from a check-kiting scheme in 1988. At trial, respondent conceded that $20,000 of the $300,698 related to attorney's fees and thus reduced the amount of unreported income from the check-kiting scheme to $280,698.

Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Background

Petitioners, husband and wife, resided in Baltimore, Maryland, at the time they filed their petition. They married in 1968 and have three children. For over 25 years, petitioner operated several small businesses in the Baltimore area, including a grocery/convenience store. During the period in issue, Mrs. Taylor remained at home and took care of the children.

Grocery/Convenience Store Business

In 1969 or 1970, petitioner began operating a "mom and pop" grocery/convenience store under the name M&E, Inc. (Despite its name, M&E, Inc., was a sole proprietorship of petitioner.) Many of petitioner's business records were in disarray. Bills for business expenses were kept in boxes, and daily gross receipts were recorded on a calendar.

Mrs. Taylor began working in the store sometime in 1990 when petitioner's criminal problems resulting from his check-kiting scheme (discussed infra) overwhelmed him. Following petitioner's incarceration in January 1991, Mrs. Taylor ran the store with one

of her sons 7 days a week, operating the cash register, taking inventory, depositing receipts, and writing checks to pay the store's creditors.

Check-Kiting Scheme

In late 1980 or early 1981, petitioner began a check-kiting scheme. Check kiting involves writing checks on a bank account that has insufficient funds and depositing those checks into an account at another bank (the second bank). The credit received at the second bank for the deposited checks is then used to issue checks from the account at the second bank. The check kiter relies on the time (the "float time") it takes a bank (the second bank) to process checks for deposit and payment. The check kiter uses the float time (normally 3 days) to cover the "bad" checks. In the case at hand, petitioner's check-kiting scheme primarily involved accounts at Irvington Federal Savings & Loan (Irvington Federal)[3] and Commercial & Farmers Bank (Commercial & Farmers). During the years at issue, petitioner kited as much as $60,000 in checks per day.

Occasionally petitioner used check-cashing services to obtain cash needed to keep his check-kiting scheme afloat. In general, these services charged 2-1/2 percent of the amount of the check. At other times, in order to obtain cash, petitioner wrote checks

---

[3]     Irvington Federal Savings & Loan accounts were taken over by the Resolution Trust Corporation in February 1992.

to purchase gold Krugerrand coins at a premium, then sold the coins to a dealer at a discount of 5 to 8 percent.

Petitioner was aware of the requirement that banks report deposits of $10,000 or more and often made efforts to evade making deposits in those amounts.

To support his check-kiting scheme and to pay off debts, petitioner borrowed funds. He borrowed approximately $100,000 from his father-in-law, of which Mrs. Taylor was unaware, and from several other individuals. Petitioner was unable to repay all of his debts and often used funds borrowed from one person to pay what he owed to others.

In July 1988, after a Commercial & Farmers bank officer notified petitioner that his account at that bank would be frozen, and that his checks would no longer be honored, petitioner knew that his check-kiting scheme was on the verge of collapse. Petitioner then, for the first time, informed Mrs. Taylor of his check-kiting activities. The Taylors went to Irvington Federal to liquidate both the family checking account and Mrs. Taylor's savings account. Petitioner then went (without Mrs. Taylor) to the Irvington Federal branch where the president of the bank, William Ottey, maintained his office. Petitioner informed Mr. Ottey of his check-kiting activities and the action taken by Commercial & Farmers with regard to petitioner's account. Petitioner told Mr. Ottey that as a result of Commercial & Farmers' decision to freeze

his account, Irvington Federal would be left holding a number of dishonored checks.[4]  Petitioner showed Mr. Ottey a spreadsheet that detailed petitioner's check-kiting activity and told him that Commercial & Farmers checks worth approximately $163,000 were going to bounce.

Several days later, petitioner and Mrs. Taylor executed two confessed judgment promissory notes totaling $170,000 (one in the name of M&E, Inc., and one in petitioners' names, each dated July 21, 1988) to repay Irvington Federal for the bounced checks.  To secure the repayment of these notes, petitioners executed mortgages against their home and two business properties.  No evidence was presented as to petitioners' equity in the properties upon which the mortgages were given.

Although Mr. Ottey considered the $170,000 to be partial restitution for the losses incurred by Irvington Federal as a result of petitioner's check-kiting scheme, petitioners' payments pursuant to the notes were structured by Mr. Ottey as payments pursuant to a line of credit.  The line of credit statement

_____

    [4]    These checks were drawn on petitioner's Commercial & Farmers account and deposited into his Irvington Federal account in order to create a positive balance which petitioner used in turn to draw checks on his Irvington Federal account.  Because Commercial & Farmers froze petitioner's account, Irvington Federal could not present the Commercial & Farmers checks, which were deposited into petitioner's Irvington Federal account, for payment.  Thus, Irvington Federal was left holding worthless Commercial & Farmers checks which Irvington Federal had already cleared for payment.

indicated that the line of credit was for $280,698; interest at 2 percent above prime would be charged; and no monthly fixed payments were required. (Petitioners disputed the amount of liability ($280,698) Irvington Federal claimed petitioner owed it.)

In March 1990 as part of a plea agreement with the U.S. Attorney's Office, petitioner pled guilty to one count of structuring cash transactions to circumvent the $10,000 cash deposit reporting requirements. Judgment was entered in November 1990, and petitioner was sentenced to 12 months' incarceration. He served 6 months in the Federal prison in Allenwood, Pennsylvania (from January through June 1991), and was thereafter transferred to a halfway house to serve the remainder of his sentence on work release.

The plea agreement with the U.S. Attorney's Office stipulated that the check-kiting scheme caused Irvington Federal to suffer a loss of $170,000 to $280,000, and that Mr. Taylor agreed to make restitution. Pursuant to the judgment entered by the U.S. District Court for the District of Maryland, petitioner agreed to file any delinquent Federal and State income tax returns.

Petitioners' Lifestyle

Throughout the years in issue, petitioners maintained a modest lifestyle. They resided in the house they purchased in 1977; the mortgage payments were approximately $400 per month. Petitioners owned two cars, a 1983 or 1984 pickup truck and a late-1970's model

Ford station wagon, both of which were financed. Also, petitioners coowned a beach house in Annapolis, Maryland, which was sold in 1984 or 1985.

Mrs. Taylor handled the family finances. She maintained the family checking account and paid the household expenses out of the weekly $500 given to her by petitioner.

Petitioners' three children attended public schools in Baltimore County and were members of a local swim club. Occasionally, petitioners went on short family vacations to Ocean City, Maryland.

Petitioner did not purchase any jewelry, furs, or similar luxury items for Mrs. Taylor during the years in issue.

Filing of Federal Tax Returns

In January 1992, following petitioner's release from the halfway house, petitioner and his accountant, Daniel Mules, met with Revenue Officer Mario Scilipoti to discuss the filing of delinquent returns for both the grocery/convenience store and petitioners. Petitioner informed Revenue Officer Scilipoti that he believed the grocery/convenience store suffered losses during the years in issue. Petitioner further informed Revenue Officer Scilipoti that although the records for the grocery/convenience store were in disarray, he had some documents that he could use for filing the returns. Petitioner also informed Revenue Officer

Scilipoti of his criminal conviction relating to his check-kiting scheme.

Revenue Officer Scilipoti told petitioner and Mr. Mules to prepare the delinquent returns from information available and that if all the records were not complete, to file amended returns when the necessary information became available.

Petitioner provided Mr. Mules with records for preparing petitioners' delinquent returns for 1988, 1989, and 1990, which did not include records regarding the grocery/convenience store business. Petitioner did not ask Mr. Mules about the tax consequences of the check-kiting scheme. After preparing and signing the joint returns, Mr. Mules hand-delivered them to petitioner. Mr. Mules never discussed the preparation of the returns with Mrs. Taylor. Mr. Mules did not expect to prepare amended returns for petitioners if and when the grocery/convenience store business records were discovered, and petitioner told Mr. Mules that he would hand-deliver the original returns to Revenue Officer Scilipoti.

Rather than delivering the signed returns to Revenue Officer Scilipoti, petitioners mailed joint Federal tax returns for 1988, 1989, and 1990 to the Internal Revenue Service (IRS) Center in Philadelphia. The returns were received on January 29, 1992. The 1988 return reported gross income before adjustments of $13,298. The 1989 return reported gross income before adjustments of $8,842.

The 1990 return reported gross income before adjustments of $5,791. Petitioners never filed amended returns.

Mrs. Taylor knew that petitioners had not filed tax returns for the years in issue. In January 1992, when she signed the delinquent returns, Mrs. Taylor knew about the existence of petitioner's check-kiting scheme. She also knew about the grocery/convenience store business but never questioned why income from that business was not reported on the delinquent returns.

Notice of Deficiency

In the notice of deficiency, respondent determined unreported net income from the grocery/convenience store business through an analysis of the bank deposits, ledger notations, Department of Treasury statistics, and industry guidelines. The unreported net income was determined to be $72,919 for 1988, $102,370 for 1989, and $87,877 for 1990. Respondent further determined petitioners had unreported income in 1988 from petitioner's check-kiting scheme in the amount of $300,698.[5]

Respondent determined that petitioners were liable for the fraud addition to tax for 1988, or in the event respondent's fraud determination is not sustained, an addition to tax for negligence or disregard of rules or regulations, an addition to tax for substantial understatement of tax, and an addition to tax for failure to timely file a Federal tax return. For 1989 and 1990,

---

[5]    See *supra* note 2.

respondent determined that petitioners were liable for the fraud penalties, and in the event respondent's fraud determinations are not sustained, accuracy-related penalties pursuant to section 6662 for negligence or disregard of rules or regulations or substantial understatement of tax.

OPINION

## Issue 1.  1988 Check-Kiting Income

The first issue for decision is whether petitioners must recognize $280,698 (or any lesser amount) of income for 1988 as a result of petitioner's check-kiting scheme.  Petitioners assert that Irvington Federal's shortfall from the check-kiting scheme was $170,000, not $280,698, and that because the shortfall was converted to a loan upon the execution of the confessed judgment promissory notes and mortgages in July 1988, the proceeds from the scheme are not taxable.  Respondent counters that the notes and mortgages represented restitution, not a loan.

Gross income means income from whatever source derived, including income from illegal sources.  Sec. 61; James v. United States,  366 U.S. 213 (1961); Rutkin v. United States, 343 U.S. 130 (1952); United States v. Rosenthal, 470 F.2d 837 (2d Cir. 1972); Moore v. United States, 412 F.2d 974 (5th Cir. 1969); Peters v. Commissioner, 51 T.C. 226 (1968); McSpadden v. Commissioner, 50 T.C. 478 (1968).  Generally, check kiting does not produce taxable income because it merely involves a "merry-go-round" of funds from

- 13 -

one account to another. Teichner v. Commissioner, 453 F.2d 944 (2d Cir. 1972), revg. and remanding on other grounds T.C. Memo. 1970-311; Forster v. Commissioner, T.C. Memo. 1961-281. However, when the check-kiting scheme results in bounced checks of the taxpayer and creates a loss to the financial institutions whose funds were drawn upon in the scheme, income from the check-kiting scheme is includable by the taxpayer. Romer v. Commissioner, T.C. Memo. 1996-287; Bradshaw v. Commissioner, T.C. Memo. 1996-123.

Petitioner concedes that he was engaged in a check-kiting scheme through July 1988 when it collapsed due to Commercial & Farmers' refusal to honor future checks presented by petitioner for deposit. But petitioner contends that the check-kiting scheme was converted to a loan arrangement in July 1988 when petitioners executed promissory notes and mortgages in favor of Irvington Federal. Hence, petitioners assert that the proceeds from the check-kiting scheme do not constitute taxable income. Respondent argues that the agreement reached between petitioner and Irvington Federal in July 1988 cannot be characterized as a loan, but rather as a plan of restitution. Alternatively, respondent argues that even if the agreement between Irvington Federal and petitioner could be characterized as a loan, that agreement cannot alter the taxability of the diverted funds to petitioner, i.e., inclusion of the amount of such funds as income, because the agreement was made

after the check-kiting scheme collapsed and the bank incurred losses.

For a transaction to be deemed a loan (and thus nontaxable), the parties must have intended, at the time the transaction was entered, that the money advanced be repaid. Moore v. United States, supra at 978; Commissioner v. Makransky, 321 F.2d 598, 600 (3d Cir. 1963), affg. 36 T.C. 446 (1961); Leaf v. Commissioner, 33 T.C. 1093, 1096 (1960), affd. 295 F.2d 503 (6th Cir. 1961); Kreimer v. Commissioner, T.C. Memo. 1983-672. The converse is also true:

> When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, "he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent."

James v. United States, supra at 219 (quoting North Am. Oil Consol. v. Burnet, 286 U.S. 417, 424 (1932)).

With respect to the case at hand, from the inception of petitioner's check-kiting scheme in 1980 or 1981 through the day the scheme collapsed in July 1988, Irvington Federal never consented to petitioner's overdraws. See Romer v. Commissioner, supra. Indeed, Mr. Ottey, Irvington Federal's president, testified that neither he nor the bank was aware of the check-kiting scheme until petitioner notified them of it in July 1988. And no evidence was introduced to contradict this testimony. Thus, it is clear that no loan agreement was made between petitioner and Irvington

Federal with respect to the check-kiting scheme before July 1988. And at that time, it was apparent that Irvington Federal would suffer a loss as a result of petitioner's check-kiting scheme.

In Buff v. Commissioner, 58 T.C. 224, 232 (1972), revd. 496 F.2d 847 (2d Cir. 1974), we held that where a taxpayer embezzled funds and "there is a 'consensual recognition' of indebtedness within the same taxable year, formalized by a confession of judgment," the embezzled funds are not included in income. The facts in Buff were as follows: The taxpayer embezzled funds from his employer. Upon discovery of the embezzlement, the taxpayer immediately admitted the embezzlement. He signed confessed judgments "for a debt justly due to the plaintiff [employer]". Id. at 225. The taxpayer further agreed to continue working for the employer and to pay $25 per week for repayment of the debt. He also borrowed $1,000 which he used to repay part of the debt.

We recognized in Buff that parties to a transaction, dealing at arm's length, may alter, amend, or revoke a transaction so as to change its character for tax purposes if their action takes place within the same taxable year. We thus held therein that a consensual recognition of indebtedness existed such that the embezzled funds were not includable in the taxpayer's income.

The facts in Buff are distinguishable from those herein. First, Irvington Federal never agreed to treat the repayment of the check-kiting scheme losses as a debt. Mr. Ottey testified that he

considered the repayments restitution for the losses Irvington Federal incurred, not a loan. The line of credit format employed by Mr. Ottey was solely for the bank's internal accounting use. Further, the confessed judgments signed by petitioners do not characterize the repayments as "debt" as in Buff, but only as "advances" (namely, the overdrawn funds). Moreover, we are cognizant of the fact that petitioner's plea agreement with the U.S. Attorney's Office with respect to his cash structuring charge required petitioner to make restitution to Irvington Federal.

Second, there is no evidence that petitioners would have qualified for a loan from Irvington Federal. See Quinn v. Commissioner, 62 T.C. 223, 229 (1974), affd. 524 F.2d 617 (7th Cir. 1975) (holding that no loan transaction occurred and embezzled funds were includable in income where the savings and loan could not make a loan to the taxpayer under State law). There is no evidence that the bank conducted a check of petitioners' credit-worthiness before the confessed judgments and mortgages were executed. Additionally, there is no evidence of a continued relationship between petitioners and Irvington Federal outside of the restitution payments, whereas in Buff the taxpayer continued to work for the employer for 1 month.

We do not believe petitioners' July 1988 execution of confessed judgment notes and mortgages to cover the bank's losses was intended by the parties to create a consensual loan between

Irvington Federal and petitioners so as to convert the check-kiting scheme to a debt arrangement. Consequently, we hold that the amount of the bounced checks--the amount of the loss Irvington Federal sustained--must be included in petitioners' income.

We now turn to the amount that must be included in petitioners' income; i.e., the amount of the bank's loss. Petitioners assert that Irvington Federal suffered approximately $170,000 in losses from petitioner's check-kiting scheme. Respondent claims that the losses totaled $280,698. These amounts are at the opposite ends of the range stipulated in petitioner's plea agreement with the U.S. Attorney's Office with respect to the cash-structuring charge.

Petitioner claims that $170,000 is the correct amount because that is the amount reflected in the confessed judgment promissory notes and mortgages executed by the parties in July 1988. Additionally, petitioner testified that when he presented Mr. Ottey with the spreadsheet of his check-kiting activity, he told Mr. Ottey that the total losses were approximately $163,000.

Mr. Ottey testified that Irvington Federal suffered a $280,000 loss and that $170,000 represented the maximum Irvington Federal could secure from petitioners' assets on foreclosure. Mr. Ottey claimed that the balance of the losses, $110,000, was written off by the bank and placed in a loss reserve account.

Mr. Ottey's testimony failed to persuade us that Irvington Federal suffered a $280,000 loss. Based on the record, we find that the bank's loss from petitioner's check-kiting scheme was $183,229. This amount represents the total Irvington Federal checks that Commercial & Farmers dishonored on July 13, 1988. After reducing the $183,229 by $20,000 to reflect attorneys' fees conceded by respondent, we hold that petitioners had unreported income of $163,229 in 1988 from petitioner's check-kiting scheme.

Petitioners are entitled to relief for repayments to Irvington Federal with regard to the dishonored checks. See James v. United States, 366 U.S. at 219-220. Taxpayers are permitted to deduct from income the amount of actual repayments made to the embezzled party in the year of repayment. Ianniello v. Commissioner, 98 T.C. 165, 174 (1992).[6] The character of the repayments as a loan or restitution here is irrelevant. If the taxpayer proves the actual repayment of the embezzled funds, he is entitled to treat those repayments as losses under section 165(c)(2).[7]    Mais v.

---

[6]    There is no evidence to suggest that petitioners were not cash basis taxpayers. Consequently, any amount repaid is deductible in the year of repayment. See Whitaker v. Commissioner, 259 F.2d 379, 382 (5th Cir. 1958), affg. 27 T.C. 399 (1956).

[7]    SEC. 165. LOSSES.

    (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

(continued...)

<u>Commissioner</u>, 51 T.C. 494, 497-498 (1968); Rev. Rul. 65-254, 1965-2 C.B. 50.[8]

Petitioner made repayments of at least $11,942 in 1988, $33,693 in 1989, and $19,029 in 1990. These amounts were reported on Forms 1098 sent to the IRS and petitioners by Irvington Federal. The forms indicate that they are interest payments made pursuant to the line of credit set up by Mr. Ottey to recover the losses from the check-kiting scheme. Mr. Ottey, however, testified that the line of credit structure was only a bookkeeping mechanism to keep track of both petitioner's restitution payments and Irvington Federal's loss of interest income. Mr. Ottey claims that his loan officer mistakenly sent out the Forms 1098, and that the bank did not report interest income to itself from any of petitioners' payments. Further, petitioner testified that he never agreed to a

---

[7](...continued)
> \* \* \* \* \* \* \*
> (c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to--
>
> \* \* \* \* \* \* \*
>
> (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business \* \* \*

[8] A revenue ruling reflects the Commissioner's position on an issue and is not binding on the Court. See <u>Stark v. Commissioner</u>, 86 T.C. 243, 250-251 (1986).

line of credit format and that he never designated the payments as principal or interest.

Petitioner asserts that he paid as much $1,000 per week to Irvington Federal, with a $25,000 initial payment. Mr. Ottey acknowledged that at times petitioner paid as much as $1,000 a week and in 1988 petitioner paid "a total of maybe $50,000".  Mr. Ottey further acknowledged that as of the date of petitioner's sentencing (November 20, 1990), petitioner had repaid $91,804 to Irvington Federal.

On the basis of the record, we conclude that petitioner made restitution to Irvington Federal as follows: $39,082 in 1988, $33,693 in 1989, and $19,029 in 1990.  Consequently, we hold that petitioners are entitled to reduce their income for each of the years in issue by those respective amounts.

Issue 2.  Fraud Addition to Tax and Penalties

The second issue for decision is whether petitioner is liable for the fraud addition to tax or penalties for each year in issue. Respondent determined the fraud addition to tax for 1988 pursuant to section 6653(b)(1) and fraud penalties for 1989 and 1990 pursuant to section 6663.  Petitioner asserts that he lacked the necessary intent to evade taxes.

Respondent has the burden of proving fraud by clear and convincing evidence.  Sec. 7454(a); Rule 142(b).  Respondent must show that the taxpayer intended to evade taxes known to be owing by

conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Fraud can never be presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Fraud may be proven by circumstantial evidence, Stone v. Commissioner, 56 T.C. 213, 223-224 (1971), and the Court may consider the taxpayer's entire course of conduct, Rowlee v. Commissioner, supra at 1123.

To prove fraud, respondent relies primarily on petitioners' failure to report the income from the grocery/convenience store business, as well as the check-kiting scheme, on their original delinquent returns or on amended returns. Respondent asserts that: (1) Petitioner did not file the delinquent returns with Revenue Officer Scilipoti in order to hide the fact that no income was reported from the grocery/convenience store business; (2) petitioner had sufficient records from his calendar of daily gross receipts and boxes of bills to calculate his net income from the grocery/convenience store business; (3) petitioner knew from his lifestyle that he had earned substantial profits from his grocery/convenience store business; and (4) petitioner knew he had income from his check-kiting scheme.

Respondent's assertions are not supported by the evidence. First, we find credible petitioner's belief that he had no profits from the grocery/convenience store business and that his lack of adequate books and records prevented him from establishing

otherwise. Petitioner's testimony that the records were in disarray is also credible. The lack of organized records, given petitioner's criminal problems during the years in issue, does not reflect an intent to evade taxes. See Marinzulich v. Commissioner, 31 T.C. 487 (1958); Ouellette v. Commissioner, T.C. Memo. 1971-98. Second, we believe petitioner never understood that he was supposed to file the delinquent returns directly with Revenue Officer Scilipoti, as respondent contends. In this regard, Revenue Officer Scilipoti testified only that it was his standard operating procedure to ask taxpayers to submit delinquent returns directly to him. Revenue Officer Scilipoti did not testify that he specifically told petitioner to hand-deliver petitioners' tax returns to him. Additionally, there was never any clear understanding about the filing of amended returns. Mr. Mules testified that he did not expect to prepare them, and petitioner testified that he was not aware of his obligation to file amended returns. The failure to file amended returns does not evince an intent to evade taxes. Broadhead v. Commissioner, T.C. Memo. 1955-328.

Third, apparently relying on the notes and mortgages executed in favor of Irvington Federal, petitioner did not know that the check-kiting scheme resulted in taxable income, and apparently Revenue Officer Scilipoti did not recognize the issue either. The lack of knowledge that ill-gotten gains are taxable tends to show

lack of intent to evade taxes. Cipparone v. Commissioner, T.C. Memo. 1985-234; Hauser v. Commissioner, T.C. Memo. 1970-207.

We also find significant petitioner's attempt to promptly resolve his tax problems following his release from Federal prison and the halfway house. He did not evade Revenue Officer Scilipoti's request to meet; moreover, in less than 2 weeks after the meeting, petitioners filed their delinquent returns.

On the basis of all the facts and circumstances, we hold that respondent has failed to prove by clear and convincing evidence that petitioner intended to evade taxes and defraud the Government for the years in issue.

Issue 3. Innocent Spouse Relief

The third issue for decision is whether Mrs. Taylor is entitled to innocent spouse relief pursuant to section 6013(e). Mrs. Taylor claims that she is entitled to such relief for each year in issue. Respondent contends that Mrs. Taylor fails two of the four requirements for relief.

Spouses who file a joint income tax return generally are jointly and severally liable for its accuracy and the tax due, including any additional taxes, interest, or penalties determined on audit of the return. Sec. 6013(d)(3). However, pursuant to section 6013(e), a spouse (commonly referred to as an innocent spouse) can be relieved of tax liability if that spouse proves: (1) A joint income tax return was filed; (2) the return contained a

substantial understatement of tax attributable to grossly erroneous items of the other spouse; (3) in signing the return, the spouse seeking relief did not know, and had no reason to know, of the substantial understatement; and (4) under the circumstances it would be inequitable to hold the spouse seeking relief liable for the understatement. Sec. 6013(e). The spouse seeking relief bears the burden of proving that each of the four elements of the statute has been satisfied, and failure to satisfy any one of the elements will prevent innocent spouse relief. Purcell v. Commissioner, 826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986); Bokum v. Commissioner, 94 T.C. 126, 138-139 (1990), affd. 992 F.2d 1132 (11th Cir. 1993).

Respondent concedes that Mrs. Taylor has satisfied the first two statutory requirements for innocent spouse relief.

Mrs. Taylor asserts that she did not know, nor had reason to know, of the substantial understatement of income. To establish this claim, Mrs. Taylor must prove that she was unaware of the circumstances that gave rise to the omission of income. See Purcell v. Commissioner, 86 T.C. at 238. She must demonstrate lack of both actual and constructive knowledge of the omission such that a reasonable person could not have been expected to know that the tax liability stated was erroneous or that further inquiry was necessary. See Stevens v. Commissioner, 872 F.2d 1499, 1504-1505 (11th Cir. 1989), affg. T.C. Memo. 1988-63.

The record is clear that Mrs. Taylor knew of the substantial understatement of income from both petitioner's check-kiting scheme and the grocery/convenience store business. Mrs. Taylor admitted at trial that she was told by petitioner of the check-kiting scheme in July 1988, approximately 3-1/2 years prior to the filing of the delinquent returns. This fact prevents Mrs. Taylor from obtaining innocent spouse relief with respect to the check-kiting income in 1988. See Krause v. Commissioner, T.C. Memo. 1991-13; Newton v. Commissioner, T.C. Memo. 1990-606; Bents v. Commissioner, T.C. Memo. 1990-487. Although Mrs. Taylor may not have known the tax consequences of the check-kiting scheme, that ignorance is no basis for relief. See Krause v. Commissioner, supra; Newton v. Commissioner, supra; Trimmer v. Commissioner, T.C. Memo. 1983-131.

With respect to the grocery/convenience store business, Mrs. Taylor was fully aware that this business existed during 1988, 1989, and 1990, and she even worked in the store for a short period during 1990 and much of 1991. Although Mrs. Taylor may have believed from her conversations with petitioner that the grocery/convenience store was operating at a loss during the years in issue, she knew from her participation in the business that the grocery/convenience store was generating gross receipts. Mrs. Taylor made deposits of cash receipts and wrote checks to creditors while working at the store. She testified, however, that she did not review the joint returns she signed, and thus she never had

reason to know that the grocery/convenience store income was not reported.

Taxpayers have an obligation to review tax returns before signing them, and they are ordinarily charged with constructive knowledge of the contents of the returns if they do not review them. Hayman v. Commissioner, 992 F.2d 1256, 1262 (2d Cir. 1993), affg. T.C. Memo. 1992-228. Taxpayers generally cannot turn a blind eye to what is disclosed on the tax return and plead ignorance. Edmondson v. Commissioner, T.C. Memo. 1996-393; Cohen v. Commissioner, T.C. Memo. 1987-537.

Mrs. Taylor's knowledge of, and involvement in, the grocery/convenience store business put her on notice of the unreported income, even though petitioner may have suggested to her that the business was losing money. See Alberts v. Commissioner, T.C. Memo. 1986-483. When that income was omitted from the joint returns, Mrs. Taylor had a duty to inquire of petitioner as to the reporting of that income. See Zimmerman v. Commissioner, T.C. Memo. 1996-223. Petitioner's financial and criminal problems should have also prompted Mrs. Taylor to review the joint returns. See Starr v. Commissioner, T.C. Memo. 1995-190, affd. without published opinion 99 F.3d 1146 (9th Cir. 1996).

Mrs. Taylor presented no evidence supporting her innocent spouse claim with respect to the other items of income (which

petitioners conceded, see <u>supra</u> note 1) and thus failed to meet her burden of proof with respect to those items.  Rule 142(a).

Thus, we hold that Mrs. Taylor is not entitled to innocent spouse relief and is liable for the deficiencies for the years in issue.

<u>Issue 4.  Negligence, Substantial Understatement, and Failure To File</u>

The final issue for decision is whether petitioners are liable for additions to tax for negligence or disregard of rules or regulations pursuant to section 6653(a)(1), substantial understatement of tax pursuant to section 6661(a), and failure to file their Federal tax return pursuant to section 6651(a)(1) for 1988; and whether petitioners are liable for accuracy-related penalties pursuant to section 6662 for negligence or disregard of rules or regulations, or substantial understatement of tax for 1989 and 1990.  Respondent made these determinations as an alternative to the fraud addition to tax and penalties.

For 1988, section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of the underpayment is attributable to negligence or disregard of rules or regulations. "Negligence" means any failure to make a reasonable attempt to comply with the Internal Revenue Code, and "disregard" includes any careless, reckless, or intentional disregard.  Sec. 6653(a)(3). For 1988, section 6661(a) imposes an addition to tax equal to 25 percent of the amount of any underpayment attributable to a

substantial understatement of income tax. A substantial understatement means an understatement which exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. Sec. 6661(b)(1). Finally, section 6651(a)(1) imposes an addition to tax of 5 percent of the tax required to be shown on the return for each month or fraction thereof for which a return is not filed, not to exceed 25 percent. An exception is made where the failure to file the return is due to reasonable cause not the result of willful neglect.

For 1989 and 1990, section 6662(a) imposes an accuracy-related penalty of an amount equal to 20 percent of the portion of the underpayment attributable to negligence or disregard of rules or regulations, or to a substantial understatement of tax.

Negligence is defined as a lack of due care or failure to do what a reasonable person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). A taxpayer is not liable for negligence or disregard of rules or regulations, or substantial understatement of tax, if he shows that he acted with reasonable cause and in good faith with respect to the underpayment in issue. Sec. 6664(c). The most important factor in determining reasonable cause is the extent of the taxpayer's effort to assess the proper tax liability. Sec. 1.6664-4(b), Income Tax Regs. The reasonable cause exception applies only to returns due after December 31, 1989 (without regard to extensions). Omnibus Budget Reconciliation Act

of 1989 (OBRA), Pub. L. 101-239, sec. 7721(a), 103 Stat. 2106, 2395.

Petitioners assert that they are not liable for the addition to tax and accuracy-related penalties for negligence or disregard of rules or regulations, or substantial understatement of tax, because of their state of upheaval during the investigation and prosecution of petitioner for his check-kiting activity.

With respect to 1988, the reasonable cause exception does not apply. OBRA sec. 7721(a). Thus for 1988, petitioners are liable for the addition to tax for negligence pursuant to section 6653(a)(1) and the addition to tax for substantial understatement of tax pursuant to section 6661(a). Petitioners presented no evidence with respect to the failure to timely file their 1988 Federal tax return, and thus they are liable for the addition to tax pursuant to section 6651(a)(1). Rule 142(a).

With respect to 1988, 1989, and 1990, petitioners made an inadequate effort to determine their proper tax liability. Although their business records were generally in disarray, petitioners had some grocery/convenience store records that could have been presented to their accountant, Mr. Mules, or to Revenue Officer Scilipoti, including the box of bills and the calendar reflecting daily gross receipts. These records were presented to petitioners' attorney and to the IRS in the course of the IRS's audit. Petitioner's preoccupation with his criminal problems does

not excuse the failure to report income from the grocery/convenience store business or any other item. See <u>Kenroy, Inc. v. Commissioner</u>, T.C. Memo. 1984-232. The failure to keep adequate records, in contravention of section 6001, supports the imposition of the negligence addition to tax and the accuracy-related penalty. See <u>Maguire v. Commissioner</u>, T.C. Memo. 1996-145; <u>Tabbi v. Commissioner</u>, T.C. Memo. 1995-463; <u>Simonelli v. Commissioner</u>, T.C. Memo. 1985-12.

Finally, petitioners made no efforts to obtain professional advice to determine the tax consequences of the check-kiting scheme before filing their tax returns. They never asked either their accountant or a tax attorney about how to report those activities. Given their lack of knowledge of the tax law, petitioners should have sought advice about the tax implications of the check-kiting scheme. Cf. <u>Krause v. Commissioner</u>, T.C. Memo. 1991-13.

Thus, for 1988, we hold that petitioners are liable for additions to tax for negligence or disregard of rules or regulations pursuant to section 6653(a)(1), substantial understatement of tax pursuant to section 6661(a)(1), and failure to timely file their return. For 1989 and 1990, we hold that petitioners are liable for the accuracy-related penalties for negligence or disregard of rules or regulations pursuant to section 6662.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered under Rule 155</u>.